UNITED STATES of America,
Plaintiff-Appellee,

v.

James B. ANDERSON,
Defendant-Appellant.

No. 74–3534.

United States Court of Appeals,
Fifth Circuit.

Nov. 28, 1975.

L. Drew Redden, William N. Clark, Birmingham, Ala., for defendant-appellant.

Wayman G. Sherrer, U. S. Atty., J. Stephen Salter, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

The defendant, a medical doctor, was convicted on one conspiracy count and 16 substantive counts charging possession with intent to distribute amphetamines in violation of 21 U.S.C. § 841(a)(1). The District Court permitted a prosecution witness to testify regarding defendant's actions and statements during a government-sponsored encounter after his in-

dictment and in the absence of retained counsel. Admission of this evidence was reversible error under *Massiah v. U. S.*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

The indictment was handed down April 3, 1974, charging offenses occurring between September 15, 1970, and October 19, 1973. On July 15, 1974, a week before trial, a Drug Enforcement Administration special agent sent Edna Kilgore, a paid informer, to defendant's clinic. She was not defendant's patient and had never seen him. She presented herself under an alias. Kilgore told Dr. Anderson that she was a prostitute and needed quaalude, a barbiturate, to aid her in sleeping and to increase her sexual arousal. Apparently not understanding her pronunciation of the drug, defendant called a local druggist for clarification and at that time authorized a prescription for an amphetamine called didrex, another controlled drug requested by Kilgore, who told the defendant she had received it previously for weight control. Explaining that quaalude had been reclassified as a "Schedule II" drug[1] because of its misuse, Dr. Anderson issued the written prescription required. Afterward Kilgore received a physical examination consisting of checks on her weight, blood pressure and heart beat.

At the trial Kilgore's testimony was proffered to "go towards a showing of pattern and scheme on the part of this defendant to relate to his intent to violate the law."[2] It was admitted for its probative value on the question of Dr.

Anderson's specific intent, as an exception to the rule that evidence dealing with offenses not charged in the indictment is inadmissible.

In *Massiah* petitioner was indicted for violating federal narcotics laws, retained a lawyer, pleaded not guilty, and was released on bail. Unknown to him, a co-defendant, having decided to cooperate with government agents in a continuing investigation of their alleged narcotics activities, permitted the installation of a radio transmitter under the front seat of his automobile. Without his counsel present Massiah made several incriminating statements to his co-defendant while seated in the latter's automobile. The federal agent who listened over the radio to the entire conversation testified against Massiah. Reversing the conviction, the Supreme Court declared: "We hold that the petitioner was denied the basic protections of that guarantee [Sixth Amendment right to counsel] when there was used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250. Justice Stewart's opinion stressed that "indirect and surreptitious interrogations" were within the ambit of the constitutional rule announced in *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), disapproving post-indictment interrogations of defendants without the protection afforded by the presence of counsel.

Some circuits have broadly construed *Massiah* to render inadmissible all post-

---

1. A Schedule II drug or substance, as defined in 21 U.S.C. § 812(b) has a high potential for abuse and a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Its abuse may lead to severe psychological or physical dependence.

2. This colloquy between counsel and court relating to admissibility of Kilgore's testimony sheds light on the government's theory:

  "Mr. Salter [Prosecutor]: The government is travelling on the theory that the defendant is charged with intent to violate the laws charged generally in the conspiracy stat-

ute, and specifically in the seventeen substantive counts. Intent to distribute them unlawfully, that is without the course of a normal professional practice. We feel that this—

  "The Court: I think you have that burden, too.

  "Mr. Salter: We feel that this witness would be a perfect and representative sample of that pattern, scheme, and conduct of the defendant, and also showing that he did have that intent to violate the law at the time of the indictment, and that intent continues even until today."

indictment statements secured in the absence of counsel. See the discussion in *U. S. v. Deloy*, 421 F.2d 900 (CA5, 1970). In *U. S. v. Venere*, 416 F.2d 144 (CA5, 1969), this circuit had refused to adopt the automatic exclusion interpretation of *Massiah*, and in *Deloy* we reaffirmed our position and suggested special circumstances which would trigger its application. In *Deloy* an overzealous indicted defendant made numerous voluntary and unsolicited visits to FBI agents, and on each occasion he insisted on making incriminating statements after being thoroughly advised of his *Miranda* rights and encouraged to contact his attorney. Other than the bare absence of counsel the case presented "not even a suggestion of any additional circumstance which would render Deloy's statements inadmissible:"

> No clandestine activity, surreptitiousness, or other "dirty pool" was engaged in by the government agents . . . He [Deloy] was not coerced, cajoled, or tricked into an involuntary statement. The government did not elicit, solicit, or even suggest a statement and did not otherwise treat the defendant unfairly. *Id.* at 902.

■ The government's conduct in the circumstances here presented is a departure from the constitutional underpinnings of *Massiah* and our circuit's interpretation of its boundaries. The government makes no claim that the DEA was unaware that the defendant was represented by counsel, and under the circumstances an inference to that effect would be absurd. In this instance there was much more than the bare absence of counsel. The government did "solicit" and "elicit" acts and statements by the defendant. *Deloy, supra*, at 902. It did this nine months after the last act charged in the indictment and only a few days before trial was to commence. It acted pursuant to a prearranged plan, utilizing a paid informer who did not reveal her governmental connection, who appeared under an alias, fictitiously represented a need for drugs, and did not advise the potential seller that he might

desire counsel present before he incriminated himself. Under other circumstances governmental action such as this might be proper and even good investigative work. Here it collides with the right to counsel.

The government makes essentially five arguments in attempting to avoid the application of *Massiah*: (1) *Massiah* is restricted to the situation where the person acting at the behest of the government is a defecting confederate; (2) the informer's consultation with Dr. Anderson was not "interrogation" within the meaning of *Massiah*; (3) the incriminating feature of the evidence was not in the form of a verbalized "statement," but rather incrimination was inferred from the defendant's acts; (4) the incriminating information did not concern the commission vel non of the acts for which defendant was indicted; (5) the incriminating information was secured as part of a continuing investigation of suspected criminal activities, which the government is free to conduct after indictment, and no one is entitled to the presence of counsel while he is committing a crime.

■ All of these theories miss the thrust of *Massiah*'s broad concern, which is to protect an indicted defendant who has counsel from erosion of the benefits of his Sixth Amendment right to counsel, done through procuring from him, in the absence of his counsel, incriminating evidence that will facilitate his conviction. We discuss the government's arguments *seriatim*.

■ (1) No reason is even suggested why *Massiah* is limited to use of a defecting confederate as a tool. The nature of what the government does and its impact upon the rights of the defendant is not limited by the identity of the intermediary, although, of course, the intermediary's status may be a factor in the overall analysis.

■ (2) Kilgore did not carry on a question and answer session with the defendant regarding the criminal charges pending and soon to be tried, but she

made representations and requests that elicited from him incriminating responses that could be used, and were used, as evidence in the trial. Formalized oral interrogation of the defendant is not a prerequisite.

■ (3) It is another distinction without a difference that the incriminating features of the defendant's responses arguably took the form of verbal acts rather than oral expressions. They were no less government-induced and no less incriminating than oral statements. And, like orally incriminating statements, they almost surely would not have occurred had counsel been present.[3]

■ (4) The government's fourth point is that its agent, unlike the defecting confederate in *Massiah*, did not elicit incriminating statements from the defendant concerning the commission vel non of the acts for which he had been indicted; rather Dr. Anderson merely acted upon an apparent predisposition to violate the Controlled Substances Act, and, in so doing he voluntarily provided incriminating evidence of his current criminal intent, which under the rules of evidence was admissible to show his intent at the time he did the earlier acts charged in the indictment. This is facile but unsound. Conviction required proof of both actus rea and mens rea elements of the indicted offenses. Evidence resulting from the government's surreptitious confrontation with defendant is no less incriminating because it tends to prove criminal intent rather than criminal act.

■ (5) Our decision does not question the propriety of continuing governmental investigation of an indicted defendant's suspected criminal activities. We also recognize that *Massiah* does not immunize a defendant from accountability for crimes committed after his indictment. Neither principle is controlling in these circumstances. At no point in

these proceedings has the government established that there was any ongoing investigation of the defendant on the suspicion that, after being indicted, he was continuing his alleged criminal conduct. Rather, it appears that a special single-shot confrontation was arranged by the DEA to obtain from the defendant evidence of specific intent to shore up the government's case, and that it was arranged at a time, place and under circumstances that defendant's attorney would not be present. The alleged criminal conduct of the defendant in his dealings with Kilgore has neither been adjudicated criminal nor made the basis for new and additional charges against him. Moreover, any legitimate continuing investigation must reflect respect for defendant's Fifth and Sixth Amendment rights, and in this regard, we reiterate our view of *Massiah* as a vital supplement to *Miranda*, noted in *U. S. v. Hayles*, 471 F.2d 788, 791 (CA5, 1973): "*Massiah* teaches that although the government may properly continue to gather evidence against a defendant after he has been indicted, it may not nullify the protection *Miranda* affords a defendant by using trickery to extract incriminating statements from him that otherwise could not be obtained without first giving him the required warnings." We do not disagree with the generalized statement that a defendant is not entitled to the presence of counsel while he is committing a crime. That principle has been followed primarily where an unindicted defendant suspected of narcotics dealings has claimed a right to counsel at the point of a sale to an undercover government agent. See *U. S. v. Baker*, 373 F.2d 28 (CA6, 1967), and *U. S. v. Haynes*, 398 F.2d 980 (CA2, 1968) [and cases cited therein]. It cannot be applied to override the application of *Massiah*.

■ We cannot dismiss the government's violation of *Massiah* as harmless

---

**3.** This circuit drew another irrelevant distinction in *Beatty v. U. S.*, 377 F.2d 181 (CA5, 1967). We declined to apply *Massiah* on the ground that the defendant had initiated the conversation with the government agent. The Supreme Court summarily reversed on the authority of *Massiah*. 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967).

error beyond reasonable doubt. Proof of the defendant's specific intent was largely circumstantial. Many of the incidents testified to concerned dispensing of controlled substances from the clinic drug room by persons other than Dr. Anderson. And the defense had strongly attacked the testimony of the two principal witnesses on specific intent, one a former employee, the other a former patient. In fact, the defense contended that the former employee was the real culprit rather than Dr. Anderson. In this context the testimony of Kilgore, who in a fresh incident only days before, had secured prescriptions from Dr. Anderson in a face-to-face encounter, was too striking to be brushed off.

■ Other points can be quickly disposed of. We have already upheld the constitutionality of § 841(a)(1). *U. S. v. Collier*, 478 F.2d 268 (CA5, 1973); *U. S. v. Leigh*, 487 F.2d 206 (CA5, 1973). See also *U. S. v. Green*, 511 F.2d 1062 (CA7, 1975); *U. S. v. Rosenberg*, 515 F.2d 190 (CA9, 1975); *U. S. v. Bartee*, 479 F.2d 484 (CA10, 1973); *U. S. v. Badia*, 490 F.2d 296 (CA1, 1973); *U. S. v. Larson*, 507 F.2d 385 (CA9, 1974). *Contra, U. S. v. Moore*, 164 U.S.App.D.C. 319, 505 F.2d 426 (1974), *cert. granted*, 420 U.S. 923, 95 S.Ct. 1116, 43 L.Ed.2d 392 (1975).

The trial court correctly denied motions for judgment of acquittal. On all counts the evidence was sufficient to submit to the jury.

■ Clinic records obtained by a compliance investigator of the Drug Enforcement Administration were not inadmissible. There was no trickery and deceit as referred to in *U. S. v. Dawson*, 486 F.2d 1326 (CA5, 1973) and *U. S. v. Tonahill*, 430 F.2d 1042 (CA5, 1970). The investigator was not required to give a *Miranda* warning. *U. S. v. Prudden*, 424 F.2d 1021 (CA5, 1970). *Marchetti*[4] and *Grosso*[5] are not applicable by reason of the records required to be kept by the defendant. *U. S. v. Warren*, 453 F.2d 738 (CA2, 1972); *U. S. v. Resnick*, 488 F.2d 1165 (CA5, 1974) (firearms transactions records).

Evidence of other offenses relating to Ida Sue Morgan and Jane Bedford was not inadmissible. That evidence related—as did the Kilgore testimony—to proof of specific intent.

■ In 1972 we held that a *Mann*-type[6] instruction, which arguably shifts the burden of proof, should not be given and that where its effect is not alleviated by the nature of the case and the remaining portions of the charge, the giving of it will be reversible error. *U. S. v. Wilkinson*, 460 F.2d 725 (CA5, 1972). Nevertheless such a charge was given here. We assume that it will not be given again on retrial.

It is claimed that the prosecutor made improper argument to the jury by asserting his own belief in the credibility of witnesses and by referring to appellant's lack of patient records, a matter said not to have been covered by the evidence. It is not necessary to discuss these issues since we assume they will not arise at another trial.

Reversed and remanded.

4. 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

5. 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

6. *Mann v. U. S.*, 319 F.2d 404 (CA5, 1963).