UNITED STATES of America,
Plaintiff-Appellee,

v.

Mary Cullar BROWN and Edwin Richard
Brown, Defendants-Appellants.

No. 75–2484.

United States Court of Appeals,
Fifth Circuit.

April 28, 1977.

Louis M. Jepeway, Jr. (Court-Apptd.), Miami, Fla., for M. Brown.

Michael P. Gale (Court-Apptd.), Elliot S. Shaw, Miami, Fla., for E. Brown.

Robert W. Rust, U.S. Atty., J. Daniel Ennis, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

SIMPSON, Circuit Judge:

Mary Cullar Brown and Edwin Richard Brown were named defendants with co-defendants, Phyllis Brown and Marion Williams, in a four count indictment. Count I charged that the four persons conspired between August 7 and August 13, 1974, to unlawfully steal and possess Sears Merchandise Certificates having a value in excess of $100, which were part of an interstate shipment, in violation of Title 18, U.S.C., Section 659, and alleged several overt acts performed in furtherance of such conspiracy in violation of Title 18, U.S.C., Section 371. Count II charged appellant

Edwin Brown and co-defendant Marion Williams with knowingly stealing Sears Merchandise Certificates valued in excess of $100, which were part of an interstate shipment in violation of Title 18, U.S.C., §§ 659 and 2. Count III charged appellant Edwin Brown and co-defendant Marion Williams with knowingly possessing Sears Merchandise Certificates valued in excess of $100 which had been stolen while moving as an interstate shipment, in violation of Title 18, U.S.C., §§ 659 and 2. Count IV charged appellant Mary C. Brown and co-defendant Phyllis Brown with knowingly possessing Sears Merchandise Certificates valued at more than $100 which had been stolen while part of an interstate shipment, in violation of Title 18, U.S.C., §§ 659 and 2.

The district court denied Mary Brown's motion for severance and her motions to suppress evidence derived from her arrest and from her interview with an F.B.I. agent. After a joint trial, a jury found the appellants and the two co-defendants guilty as charged on all counts. Mary Brown was given a suspended sentence and placed on probation for two years. Edwin Brown, her son, was sentenced to three concurrent one year terms of confinement, after a referral under the FYCA, Title 18, U.S.C., § 5010(e) to, and report by the Youth Corrections Division of the U. S. Board of Parole.[1] The appellants each rested at the close of the government's case without presenting any evidence, so that no substantial factual variance exists in the facts before us.

Appellant Mary C. Brown seeks reversal of her conviction on the following grounds: (1) that the trial judge erroneously denied her motion to suppress her statements to the F.B.I. because they were obtained in violation of her Constitutional right to counsel; (2) that evidence derived from her arrest should have been suppressed because the arrest was illegal; (3) that her motions for judgment of acquittal should have been granted because the evidence was insuffi-

---

1. Phyllis Brown received a suspended sentence, under the Federal Youth Correction Act, Title 18, U.S.C., § 5010(e), with two years probation. Co-defendant Marion Williams was referred to the Youth Corrections Division for observation and study under the FYCA. His final sentence was still pending at the time of this appeal.

cient to support the verdict; and (4) that a Railway Express Agency (REA) waybill was erroneously introduced into evidence.[2] Appellant Edwin Brown's grounds of appeal are (1) that the evidence was insufficient to prove that the value of the goods exceeded $100, and (2) that his Constitutional rights under the Sixth Amendment were violated by the admission in evidence of his co-defendants' false statements.[3]

## I. THE UNDERLYING FACTS

In July, 1974, two Sears, Roebuck & Company stores, one in Miami, Florida, and the other in Pompano Beach, Florida, both in the Southern District of Florida, requisitioned approximately $48,000 in Sears Merchandise Certificates from the Sears' Atlanta, Georgia office. These coupons were not received by the two Florida stores. Evidence at trial indicated that the Atlanta office received these requisitions and then shipped the certificates by REA in August, 1974. The REA waybill was introduced into evidence to establish: (1) the date that the shipments left Atlanta, (2) the truck on which they traveled, (3) the interstate nature of the shipment, and (4) that the truck arrived in Miami, Florida on August 6, 1974. The certificates were sent as a "value shipment" which requires the driver's signature. According to REA's Miami manager the shipment was unloaded in Miami, Florida, on August 7, 1974. A value shipment is unloaded in the same manner as other shipments until it reaches a "marker" who pulls the value shipment from the conveyor system and hands it either to the dock supervisor or to the foreman. The supervisor or foreman then takes the package and locks it in the "value room".[4] A marker is the first person to see a value shipment. Appellant Edwin Brown and his co-defendant Marion Williams were, on August 7, 1974, working in the Miami REA office as markers. The REA manager in Miami testified that both Edwin Brown and Marion Williams were on the particular shift that unloaded the truck containing the merchandise certificates designated for Sears in Miami and Pompano Beach.

Some of the missing certificates found their way to the Sears store in Miami. On August 9, 1974, the receipts from that store showed that $100.00 of merchandise had been exchanged for certificates from the missing shipment. On the previous day, August 8, $1,200.00 worth of merchandise had been similarly exchanged. A government witness, Ray O'Hearn, testified that about August 9, 1974, he found numerous books of certificates in his trash can at his residence, about three blocks from the Sears store. He notified the Sears store personnel, who took custody of the certificates. A latent fingerprint of Edwin Brown was found on one of these certificates.[5]

On August 9, 1974, Robert Mitchell, a part-time security guard for Sears, Roebuck & Co., Miami, Florida,[6] received an emergency call from Kathy Cole, Division Manager of the jewelry department. Ms. Cole reported to Mr. Mitchell that two women, later identified as Mary C. Brown and Phyllis Brown, had been at the jewelry counter, and that one of these women (Phyllis Brown) had tried to purchase a diamond ring with $400 in unstamped Sears Merchandise Certificates.[7] Phyllis Brown used

---

**2.** Mary C. Brown also adopts Edwin Brown's two contentions on appeal as they apply to her.

**3.** Edwin Brown adopts Mary Brown's argument that the REA waybill was erroneously admitted into evidence.

**4.** If a value package is broken, the supervisor is notified and an inventory is conducted.

**5.** A fingerprint of co-defendant Marion Williams was also discovered on a certificate from this group.

**6.** At this time, Mr. Mitchell was also employed as a police officer in Hallandale, Florida. Hallandale is in Broward County, Florida. Mr. Mitchell of course had no police jurisdiction in Dade County, the location of the Miami Sears store.

**7.** Sears Merchandise Certificates or coupons are sold in Sears retail stores in different denominations and may be used to purchase merchandise in any Sears store. After purchase, and before use, it was customary for the selling store to validate certificates by use of a stamp.

the name Barbara Jones during the attempted purchase. Ms. Cole observed that both women had a large quantity of certificates in their possession.[8] Mary Brown left the jewelry department before Phyllis Brown handed the $400.00 worth of certificates to Ms. Cole. Ms. Cole phoned Mr. Mitchell in security to check on these certificates. While the call was in progress, Phyllis left the jewelry counter and joined Mary in the shoe department. They then left the store.

Mr. Mitchell followed the two women to their car in the Sears parking lot. He stopped them, displayed his Sears Security identification badge, and asked them if they had any certificates. Phyllis gave Mr. Mitchell some books of certificates. Mary denied having any. Mr. Mitchell asked the two women to return to the store with him. He then read them their Miranda rights from a card. At this time, Mary and Phyllis Brown told Mr. Mitchell that they found the certificates while they were shopping in the basement of Richards Department Store in Miami, Florida. Miami police officers later arrived and took custody of both women. Mary and Phyllis again had their Miranda rights read to them by a Miami police officer.

Mr. Mitchell testified that he found more certificates in the trash can located in the security office. Both he and Ms. Cole testified that while they were in the security office with Mary and Phyllis Brown, they noticed that Mary Brown put her purse on the trash can and placed an opened newspaper over her purse. She appeared to be reading the newspaper. Mr. Mitchell had not noticed the certificates in the security room trash can prior to this time. A latent fingerprint identified as belonging to appellant Edwin Brown was developed from the surface of one of these certificates.

On August 14, 1974, Mary and Phyllis Brown were in a corridor inside the Dade County Court House in state custody waiting to meet the State Public Defender to go to a preliminary hearing on state criminal charges,[9] when they were approached by two F.B.I. agents. This was about 30 minutes before the preliminary hearing was scheduled to start and after the State Public Defender's appointment to represent Mary Brown. These agents gave Mary and Phyllis Brown the Miranda warnings, and proceeded to interrogate them regarding the certificates. The two women were questioned separately. During the interrogation, Mary Brown denied that Edwin Brown was related to her. At trial, birth certificates were introduced showing that Edwin Brown and Phyllis Brown have a mother by the same name, Mary Elizabeth Cullar.

## II. MARY C. BROWN'S APPEAL

A. We consider first Mary Brown's claim that the trial court erroneously denied her motion to suppress statements obtained from her by Maria Parga, an F.B.I. agent. Mary contends that the F.B.I. interrogation violated her Sixth Amendment right to counsel because it took place after an attorney had been appointed to represent her. Mary and Phyllis Brown were approached by the F.B.I. agents shortly before the state preliminary hearing was scheduled to begin. After they separated for the interrogation, Mary was given the Miranda warning[10] by Agent Parga, but she was never asked if she already had an attorney to represent her. At the suppression hearing, Agent Parga testified that *she assumed Mary did have an attorney.*

Mary Brown asserts that her statements derived from this interrogation should have been excluded under the teachings of *Massiah v. United States,* 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. We agree.

■ In *Massiah,* the Supreme Court held inadmissible the defendant's incriminating

8. Ms. Cole could not recall if Mary Brown's certificates were in her purse or in her hand.

9. Arising from the same circumstances as the instant federal charges.

10. The agent read Mary her rights, asked her if she understood them, and then had Mary sign the rights form.

statements which government agents deliberately elicited from him after he had been indicted, and in absence of his counsel. *Id.* at 206, 84 S.Ct. at 1203. We find that the *Massiah* proscriptions apply even though Mary Brown was not indicted by the federal grand jury until March 6, 1975. The right to consult with counsel attaches "when the process shifts from investigatory to accusatory . . .". *Escobedo v. Illinois,* 378 U.S. 478, 492, 84 S.Ct. 1758, 1766, 12 L.Ed.2d 977, 989. *See Clifton v. United States,* 5 Cir. 1965, 341 F.2d 649, 651. "*Escobedo* and *Massiah* represent a broad indorsement by the Supreme Court of the right to have counsel present during an interrogation once the investigation has begun to focus on a particular suspect." *Clifton v. United States, supra,* 341 F.2d at 652. Here the F.B.I. interrogation took place on August 14, 1974, several days after her arrest, while Mary Brown was on her way to a preliminary hearing on state charges arising out of the identical circumstances on which the federal indictment was based. The investigation concerning the stolen Sears Merchandise Certificates was focused directly on Mary Brown. Agent Parga was not merely trying to ascertain whether or not there was probable cause to believe a crime had been committed. *See Clifton v. United States, supra.* She already knew that a crime had been committed.[11] The process was no longer investigatory in nature; it had shifted from investigatory to accusatory. Mary Brown was by now the focal point of the F.B.I.'s probe, precisely the juncture when legal advice is crucial to an individual.

The investigating F.B.I. agent here made no attempt to determine if Mary Brown had counsel. Agent Parga testified at the suppression hearing and again at the trial that she assumed Mary Brown had an attorney. But nevertheless the agent made no effort to determine if Mary had in fact retained counsel, and, if so, whether she wanted her attorney to be present at this interrogation session.[12]

Under these circumstances interrogating officers must make a reasonable attempt to determine prior to interrogation whether the individual questioned has an attorney with whom she would like to consult. *See Clifton v. United States, supra.* Here, the agent *assumed that Mary Brown had an attorney,* but failed to exercise the slight additional precaution of asking Mary Brown whether she desired to confer with her attorney before answering any questions. This failure deprived Mary Brown of her Sixth Amendment right to counsel.[13]

Our holding is not that all statements made in the absence of counsel are inadmissible. *See United States v. Anderson,* 5 Cir. 1975, 523 F.2d 1192; *United States v. Vasquez,* 5 Cir. 1973, 476 F.2d 730, cert. denied, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72; *United States v. DeLoy,* 5 Cir. 1970, 421 F.2d 900. The "bare absence of counsel" is insufficient to trigger the *Massi-*

11. Agent Parga testified at trial that she wanted to question Mary Brown "regarding some stolen Sears coupons."

12. As stated in *Clifton v. United States, supra,* "once the process has shifted from investigation to accusation the well-recognized practice in civil litigation serves as an appropriate analogy:

'16. COMMUNICATIONS WITH OPPOSITE PARTY.

A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel . . .'
American College of Trial Lawyers, Code of Trial Conduct, Canon 16. See also American Bar Association, Canons of Professional Ethics, Canon 9."
341 F.2d at 652–53, n. 9.

13. The government counters that Mary Brown waived her right to counsel, inasmuch as Agent Parga read the waiver of rights form to Mary Brown, and Mary signed the form. We are not convinced, under these circumstances, that signing the waiver of rights form constituted a sufficiently clear and unmistakable waiver of the right to the presence of counsel. *See Johnson v. Zerbst,* 1938, 304 U.S. 458, 462–65, 58 S.Ct. 1019, 1022–23, 82 L.Ed. 1461; *United States ex rel. Lopez v. Zelker,* S.D.N.Y.1972, 344 F.Supp. 1050, aff'd 2 Cir. 1972, 465 F.2d 1405, cert. denied, 409 U.S. 1049, 93 S.Ct. 529, 34 L.Ed.2d 501.

*ah* doctrine. Each case turns on the facts and circumstances surrounding the particular interrogation. See *United States v. Anderson, supra; United States v. DeLoy, supra*. In *DeLoy*, we found no reprehensible conduct on the part of the interrogators. There, the government did not even suggest that the accused make a statement. He voluntarily visited the F.B.I. and insisted on making statements after being thoroughly advised of his Constitutional rights. Moreover, the defendant was encouraged to contact his attorney prior to making any statement. See *United States v. DeLoy, supra*, 421 F.2d at 902. The situation in the instant case was significantly different.

The agents intercepted Mary and Phyllis Brown before they could reach the courtroom and their lawyers. The F.B.I. agents admittedly knew that the state preliminary hearing was scheduled for 2:00 P.M. They stopped Mary Brown for questioning at approximately 1:30 P.M. on her way to court. It should have been obvious an attorney would be present to represent her in court on that day. Indeed the agents said they assumed this was the case. This amounted to considerably more than the bare absence of counsel. The government, through agent Parga, actively solicited statements from Mary Brown. We think that this sort of conduct is proscribed by *Massiah.*

We do not conceive that the district court's error in admitting Mary Brown's statements to the F.B.I. agent Parga into evidence was harmless beyond a reasonable doubt. See *Chapman v. California*, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. The untainted evidence against her was largely circumstantial and not overwhelming. See *Harrington v. California*, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; *United States v. Anderson*, 5 Cir. 1975, 523 F.2d 1192. Introduction of the birth certificates gave rise to the logical inference that Mary Brown lied when she denied being related to Edwin Brown. Government counsel, in his closing argument to the jury, strongly emphasized the significance of this denial in light of the birth certificates. The trial judge instructed the jury that they could consider whether a false exculpatory statement points to consciousness of guilt. Under these circumstances, we hold that potential substantial prejudice to Mary Brown's rights inhered in her confrontation with the F.B.I. agent. She should have been accorded the right to have her attorney present at that confrontation. *United States v. Wade*, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. Mary Brown's statements to the F.B.I. were admitted into evidence in violation of her constitutional right to counsel, and such violation was not "harmless beyond a reasonable doubt". *Chapman v. California, supra.*

B.  Mary Brown raises three other issues on appeal. In the interest of economy of judicial time, we deal with two of these issues, as they will doubtlessly arise on a retrial of this case.[14]

■  Mary Brown additionally urges that her arrest lacked probable cause, and thus any evidence derived therefrom should have been excluded at trial. She claims that the evidence respecting the Sears certificates found in the security office trash can, under circumstances permitting the inference that she emptied them from her purse, should have been suppressed. She argues also that, even though she abandoned the certificates found in the trash can, her abandonment of them was involuntary. We find this argument to be without merit.

■  Mary Brown was arrested in Florida for a state offense. Thus, we turn to Florida law, insofar as it does not violate the Constitution, to ascertain the validity of her arrest. See *Moll v. United States*, 5 Cir. 1969, 413 F.2d 1233, 1236. According to Florida law, an arrest has occurred when an alleged offender is apprehended or taken into custody. *Range v. State*, 2 D.C.A.Fla. 1963, 156 So.2d 534. Mary Brown was initially apprehended by Mr. Mitchell. Although Mitchell is a police officer in Hallan-

---

14.  In view of our reversal on the ground of the improper admission of her statement to the F.B.I. agents on August 14, 1974, we will not consider the sufficiency of the evidence to support her conviction, the other point raised.

dale, Florida, he acted as a private citizen since he was not within his official jurisdiction when he took Mary into custody. Florida follows common law rules regarding arrests by private citizens. See *United States v. Goeden,* 5 Cir. 1970, 433 F.2d 430; *Moll· v. United States, supra; Marden v. State,* 3 D.C.A.Fla.1967, 203 So.2d 638. At common law, when a felony has actually been committed, a private citizen, acting in good faith, may lawfully arrest a person whom he reasonably believes to have committed the felony. *United States v. Montos,* 5 Cir. 1970, 421 F.2d 215, cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532; *Moll v. United States, supra.* See also, 6 C.J.S. *Arrest* § 14 (1975). Since a felony had in fact been committed, the next step is to determine whether Mr. Mitchell had reasonable grounds to believe that Mary Brown committed it.

Mary Brown was at the Sears jewelry counter when Phyllis Brown was discussing the purchase of a diamond ring. Both women were observed with books of certificates in their possession. Mary left for another department as Phyllis handed Ms. Cole several unstamped certificates. While she was busy calling security to check on these certificates, Ms. Cole observed the two women hastily leave the store. They left without the ring and without the $100 in certificates Ms. Cole had taken. Mr. Mitchell, after receiving the call, followed the women to their car and asked them if they had any more certificates. Phyllis reached under the seat of the car and handed him some books of certificates. In light of these facts, it appears that Mr. Mitchell had sufficient grounds to believe that the two women had committed a felony. More-

over, Florida statutory law permits a merchant's employee to take a person into custody and detain him in a reasonable manner for a reasonable length of time if the employee has probable cause to believe that the merchant's goods have been unlawfully taken by that person. Fla.Stat. § 901.34 (1975). See *Meadows v. F. W. Woolworth Co.,* N.D.Fla.1966, 254 F.Supp. 907. We find that Mary Brown's arrest was legal, and the evidence derived therefrom was properly received.

■ We next consider Mary Brown's further contention that the district court erroneously admitted an REA waybill into evidence.[15] The waybill was offered by the government to demonstrate the interstate character of the shipment of Sears Merchandise Certificates. Mary Brown objected to its introduction on the grounds that it is hearsay.

We believe that the waybill satisfied the requirements of the Federal Business Records Act, Title 28, U.S.C., Section 1732,[16] and qualified as an exception to the hearsay rule.

The purpose of the Business Records Act is "to dispense with the necessity of proving each and every entry by the person or persons actually making them." *Louisville & Nashville R. R. v. Knox Homes Corp.,* 5 Cir. 1965, 343 F.2d 887, 896. The underlying theory is that business records in the form regularly kept by the particular company and relied on by that company in the ordinary course of its business are trustworthy. See *United States v. Fendley,* 5 Cir. 1975, 522 F.2d 181, 184. In *Sabatino v. Curtiss National Bank of Miami Springs,* 5 Cir. 1969, 415 F.2d 632, this court set forth a

**15.** The record indicates that more than one REA waybill was introduced, but the same reasoning applies to both.

**16.** Title 28, U.S.C., § 1732, reads in part:
"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made·as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence or event, if made in regular course of

any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

three-pronged test to determine the admissibility of business records:

"(1) the records must be kept pursuant to some routine *procedure* designed to assure their accuracy,

(2) they must be created for *motives* that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and

(3) they must not themselves be mere cumulations of hearsay or uninformed opinion."

415 F.2d at 637. See further, *United States v. Ragano,* 5 Cir. 1975, 520 F.2d 1191, 1200.

The basic prerequisites to admission under the Federal Business Records Act are present in the instant case. A special agent of REA testified that these records were kept in the regular course of his business, and that it was the regular course of his business to make and keep said records. See *Louisville & Nashville R. R. v. Knox Homes Corp., supra;* Title 28, U.S.C., Section 1732. He further stated that he was familiar with business practices of REA in Atlanta. His testimony evidenced a sufficiently detailed knowledge of REA procedures and forms used in sending and receiving shipments. The agent adequately authenticated the record's accuracy and explained the efforts employed to ensure this accuracy. See *United States v. Blake,* 5 Cir. 1973, 488 F.2d 101. We have held, moreover, that the trial court has broad discretion in determining the admissibility of business records. *United States v. Fendley,* 5 Cir. 1975, 522 F.2d 181, 184. Its determination should not be overturned absent a showing that it has abused its discretion, *Id.,* and no showing of such abuse is made on this appeal. The REA waybill satisfied the statutory requirements of Title 28, U.S.C., § 1732, and was properly received in evidence.[17]

## III. EDWIN BROWN'S APPEAL

■ We turn now to the two separate issues raised on appeal by Edwin Brown. He initially argues that there was insufficient evidence to prove that the value of the goods in question exceeded $100.[18] He asserts that the value question was erroneously submitted to the jury. We disagree.

The value of the stolen certificates as being over or under $100 was in issue only as a determinant of whether the theft involved was a felony or a misdemeanor. Title 18, U.S.C., Section 659. Edwin Brown urges that the monetary value of the Sears certificates differs considerably from their face value. His position is that there was no jury question presented as to value, but that he was entitled to an affirmative charge that their value was less than $100. He advances two facts as supportive of his theory: (1) the shipment of certificates was insured for only $150, and (2) the certificates were unstamped. Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704, we must determine if reasonable minds could conclude that the evidence is inconsistent with the hypothesis that the certificates' value was less than $100. See *United States v. Warner,* 5 Cir. 1971, 441 F.2d 821, 825, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. The value placed on the shipment for insurance is not determinative of the value question in this case, but is only a single factor to be assessed in weighing all of the evidence. Testimony was introduced indicating that the certificates were worth their face amount, whether they were stamped or unstamped. Several Sears' employees testified that the stamping procedure is merely a form of identification for accounting purposes, and that the certificates are negotiable at a

---

**17.** This holding applies to the appeal of Edwin Brown, which also raises the issue of the ruling allowing the REA waybill in evidence.

**18.** Mary Brown also adopts this contention. There was evidence that both Mary and Edwin Brown had certificates in their possession. Edwin Brown's fingerprints were found on $150

worth of the missing certificates. Mary Brown was seen with several books of certificates in her possession. Approximately $750 worth of missing certificates were found in a trash can located next to the seat she had occupied in the Sears security office. Edwin Brown's fingerprint appeared on one of these certificates also.

Sears store with or without the stamp. Significantly, on August 9, 1974, the day that Mary and Phyllis Brown were arrested, the Sears store in Miami accepted $100 in unstamped certificates in exchange for merchandise. On the previous day, $1,200 in unstamped certificates were exchanged for merchandise.

Value may be proved by circumstantial evidence. *United States v. Tyler,* 5 Cir. 1973, 474 F.2d 1079. The certificates had a fixed value and a potential worth which greatly exceeded $100, persuasive evidence of their value. *United States v. Tyler, supra.* Moreover, the conduct of the parties indicated a belief that the certificates were fully negotiable. "All reasonable inferences and credibility choices as will support the jury's verdict . . . must be made." *United States v. Black,* 5 Cir. 1974, 497 F.2d 1039, 1041. While the evidence was subject to conflicting inferences, we perceive that it was sufficient to sustain the jury's determination that the certificates were worth more than $100.

■ Edwin Brown finally argues that admission of his co-defendants' false exculpatory statements violated his rights under the Sixth Amendment. He urges that *Bruton v. United States,* 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, is controlling in this case and requires reversal. We do not agree that a *Bruton* question was presented. In *Bruton,* a co-defendant's confession directly inculpated the defendant, who had no opportunity to cross-examine the co-defendant when he failed to testify. The Supreme Court found the confession to be "powerfully incriminating" and "devastating to the defendant". 391 U.S. at 135–36, 88 S.Ct. at 1628. *Bruton* does not require that all out of court confessions or statements by co-defendants be excluded. See *United States v. Hicks,* 5 Cir. 1975, 524 F.2d 1001. Only those should be excluded which "directly inculpate the complaining co-defendants, as well as the declarant". *United States v. Hicks, supra,* 524 F.2d at 1003.

Edwin Brown claims that statements made by his co-defendants Mary and Phyllis Brown, in which they denied knowing him were unduly prejudicial and thus their admission violated the *Bruton* rule. He argues that the evidence against him was weak and that these false statements supplied the necessary direct nexus between him and his co-defendants. We disagree. The statements made by Mary and Phyllis Brown were by no means equivalent to confessions. Indeed, they were exculpatory, although apparently false at least in part. These statements, while perhaps indicative of consciousness of guilt on the part of Mary and Phyllis, did not at all reflect Edwin's guilt. Other evidence linked him to the co-defendants as well as to the stolen certificates. For example, the birth certificates alone demonstrated his relationship to his co-defendants. His fingerprints were found on two coupon books and on a certificate found in the Sears security room trash can. Of the utmost importance to the case against him was proof that he and Marion Williams were on duty as markers unloading the shipment of certificates. Since the statements by Mary and Phyllis did not inculpate Edwin Brown, we deem the connection between the statements and Edwin's culpability to be too remote to require reversal under *Bruton.*

Accordingly, we affirm appellant Edwin Brown's conviction. Appellant Mary Brown's conviction is reversed and remanded for further proceedings consistent herewith.

REVERSED as to Mary C. Brown's appeal;

AFFIRMED as to Edwin Brown's appeal.

FAY, Circuit Judge, dissenting:

With great respect for my brothers constituting the majority, I must dissent from that portion of the opinion which holds Mary Brown's statements to Agent Parga on August 14, 1974 inadmissible. It seems to me that the majority holding establishes a rule of law directly in conflict with the well established doctrine of waiver as found by the district judge. If there can be no waiver under these undisputed facts, there can be no waiver of counsel and all state-

ments made in the absence of counsel are inadmissible.

Most of the factual background is set forth in clear precise detail; however, since the majority hinges "upon the right to have counsel present during an interrogation" and bases the ruling upon the agents failure to determine if Mary Brown had in fact retained counsel, and whether she wanted her attorney to be present at this interrogation, some additional expansion may be helpful. Mary Brown was not in state custody. She was arrested on August 9, 1974 and after spending the night in jail was released on bond. At that bond hearing on August 10, 1974, the public defender was appointed to represent her. On August 14, 1974, she was on her way to a preliminary hearing scheduled to be heard in the state courthouse.

Mary Brown had a college education having attended Florida Memorial College in St. Augustine, Florida for four years. She worked as an elementary school teacher for thirteen years. After encountering Mary Brown, Agent Parga identified herself, explained the purpose of her interception and read the full *Miranda* warnings as follows:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

After this reading, Agent Parga had Mary Brown read and sign the following waiver:

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Agent Parga assumed that Mary Brown had an attorney. Surely Mary Brown knew she had an attorney as she was on her way to meet with him before the scheduled hearing. Just how Agent Parga could have determined in a more precise manner whether or not Mary Brown desired her attorney be present during the questioning is not clear to me.

The majority opinion cites *Massiah* and other cases to support its rationale. I have no quarrel with any of these recognized authorities but wish to point out why factually they are not controlling.

In *Massiah* the petitioner had already been indicted, retained an attorney, pled not guilty and been released on bail. The federal agent involved, without petitioner's knowledge, planted a listening device in a co-indictee's car knowing the petitioner would ride in it while he was free on bail. The Supreme Court found that incriminating statements made by the petitioner at this time were excludable under the Constitution.

*Escobedo* is also cited by the majority for the premise that a defendant's right to speak with his attorney begins "when the process shifts from investigatory to accusatory." *Escobedo v. Illinois*, 378 U.S. 478, 492, 84 S.Ct. 1758, 1766, 12 L.Ed.2d 977, 989. In *Escobedo*, the defendant was taken into custody by the police and during a grueling interrogation he repeatedly asked to see his attorney (who was waiting to see him). He was denied this right and eventually confessed to murder. The Supreme Court held:

. . . that where . . . the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the

police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution . . . and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.

*Escobedo, supra,* 378 U.S. 478, 490–491, 84 S.Ct. at 1765.

The majority also cites *Clifton v. United States,* 341 F.2d 649 (5th Cir. 1965), as an example of *Escobedo* being applied in the Fifth Circuit. In *Clifton,* the defendant, in jail over two months, awaiting trial, had voluntarily requested the federal agents to come see him but when he was being taken for the interview he repeatedly requested that his attorney be called. This court stated:

> While we hold that interrogating officers must make some reasonable attempt to ascertain whether such an accused has an attorney and desires that he be present, we *do not* reach the question of admissibility where the accused has clearly and unequivocally waived the right to consult his attorney . . . The record in this case discloses that the interviewing officers should have known that the accused was represented by counsel, and that they made no reasonable effort to ascertain whether he desired to consult with his attorney. (Emphasis added).

*Clifton, supra,* p. 653. Therefore his incriminating statements were not admissible at trial.

Then cited are *Anderson, DeLoy* and *Vasquez* for the proposition that not all statements made without counsel present are inadmissible.

In *United States v. Anderson,* 523 F.2d 1192 (5th Cir. 1975), this court reversed the district court for ". . . permitt[ing] a prosecution witness to testify regarding de-fendant's actions and statements during a [surreptitious] government-sponsored encounter *after his indictment* and in the absence of retained counsel." (Emphasis added) *Supra* pp. 1193–1194.

The facts of *United States v. DeLoy,* 421 F.2d 900 (5th Cir. 1970) indicate the defendant on his own initiative made incriminating statements to the F.B.I. after a knowing waiver of his rights. The court held that *Massiah* did not extend so far as to require a reversal of defendant's conviction. The court even stated:

> This circuit has plainly adopted the more restrictive reading of *Massiah,* requiring, in effect, that there be some circumstance more than the bare absence of counsel before a defendant's post-indictment statement is rendered inadmissable. (Citations omitted).

*DeLoy, supra,* p. 902.

As stated by the majority, this circuit does recognize the validity of a voluntary waiver of the presence of counsel. The case of *United States v. Vasquez,* 476 F.2d 730 (5th Cir. 1973) is strikingly similar. Defendant Vasquez was in custody in a Florida County jail on a state charge of murder when an F.B.I. agent came to question him about an M–14 rifle that had been seized in connection with a recent shooting. Vasquez was advised of his rights including the right to have the advice of counsel, waived that right and agreed to discuss the rifle (not the shooting) with the F.B.I. agent. Vasquez was represented by an attorney who had been appointed for him on the state charge. Defendant was subsequently charged and convicted of the federal crime of possession of an unregistered firearm. This court affirmed that conviction stating:

> In this case where the defendant was carefully apprised of his right to have counsel, there is *no merit* in the contention that the defendant was unable to waive that right.

*Supra,* p. 733.

In the case at bar this defendant also had state charges against her but had not yet been indicted. There was no federal indict-

ment or even an arrest on federal charges. Here as in *Vasquez* the agents were investigating the possibility of a violation of federal law.

Frankly, if the majority opinion had based its holding upon governmental misconduct I would better understand. We cannot condone such tactics as deliberately intercepting a "known target" in a criminal investigation walking through the halls of a state court en route to a conference with her attorney to prepare for a preliminary hearing. But would the majority hold differently if the interview had been held at Mary Brown's residence on August 13, 1974? I think so and am therefore concerned about the principle of law being established rather than the result.

In my opinion, Mary Brown made a clear and unequivocal waiver of her right to the presence of counsel and I, therefore, dissent.