UNITED STATES of America,
Plaintiff–Appellee,

v.

Edward Robelto IBLE,
Defendant–Appellant.

No. 79–5687.

United States Court of Appeals,
Fifth Circuit.

Nov. 14, 1980.

Archibald J. Thomas, III, Jacksonville, Fla., for defendant–appellant.

Russell W. LaPeer, Asst. U. S. Atty., Jacksonville, Fla. for plaintiff–appellee.

Before RONEY, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

Appellant, Edward Ible, seeks reversal of his conviction for unlawful possession of counterfeit currency in violation of 18 U.S.C. § 472. Several points are raised by appellant, but the failure of the government to comply with Federal Rules of Criminal Procedure 16(a)(1)(A), by not providing defense counsel with appellant's oral statements made in response to interrogation by the arresting Secret Service agent, requires our reversal and remand for a retrial.

## I.

Appellant was arrested on a state counterfeit charge at an outdoor jobsite in Sumter County, Florida, by two detectives of the Leesburg Police Department, located in Lake County, Florida. With the arresting officers was a federal Secret Service agent who subsequently made a federal arrest of the appellant after he had been transported back to the Leesburg Police Department and interrogated. One plainclothes Sumter County Deputy Sheriff and one uniformed Deputy Sheriff were also present at the arrest, but did not participate.

The arresting Leesburg officers had been investigating the distribution of two counterfeit $20 bills at a drugstore in Leesburg. The arresting federal agent had been investigating a similar report of counterfeit distribution at a bar near Leesburg. In the process of these separate investigations the police detectives and the federal agent rendezvoused and rode together to the open field jobsite at which appellant was arrested.[1]

1. The Leesburg officers had contacted the appellant's wife at her home based on an identification made by employees of the drugstore where two counterfeit $20 notes had been passed. Appellant's wife told the officers that she had received the money from her husband the previous evening, that he had an inch high stack of similar bills in his possession, that other bills had been given by her husband to co–workers, that some of the bills had been passed in Leesburg and that her husband was presently at work. She turned over to the officers all bills in her possession that had been given to her by the appellant.

The arresting officers were in an unmarked vehicle and not in uniform. In making the arrest, the senior Leesburg police detective verbally identified himself, placed his hand on his gun[2] and informed appellant that he was under arrest. The other Leesburg officer assisted the arresting officer by giving the appellant his warnings and frisking the appellant for weapons and contraband. This officer identified himself, displayed his badge and seized appellant's wallet containing nineteen counterfeit $20 federal reserve notes. No weapons were drawn.

Based upon appellant's statements at the scene the arresting officers searched a nearby wooded area where appellant claimed to have discovered the counterfeit money on the day previous to his arrest. Upon failing to discover any other counterfeit bills in the area, appellant, his two co–workers, the Secret Service agent and the two Leesburg officers proceeded toward Leesburg in the unmarked vehicle in which the arresting officer had arrived. Enroute they stopped to search a roadside area where one of the appellant's co–workers claimed he had placed in a beer can and thrown away four $20 federal reserve notes given to him by the appellant the previous day.[3] This search was also unsuccessful. Once again enroute, the Leesburg officers and Secret Service agent decided to recover additional counterfeit $20 bills which they had learned during initial interrogation of appellant and his co–workers had been passed that morning. They made two stops and recovered those bills.[4] Appellant was aware of each recovery.

Upon arrival at the Leesburg Police Department, appellant was again apprised of his *Miranda* rights and interrogated by the arresting state officer with the Secret Service agent present. At that time appellant made certain oral admissions. The arresting state officer then sought to have appellant reduce to writing his earlier oral admissions. Appellant did so in part. The state officer then sought additions to this written statement based on the previous oral admissions and the appellant complied.[5] Shortly after this, appellant was again given his *Miranda* warnings, interrogated by the Secret Service agent and arrested. During this interrogation the appellant made further oral statements but no written statement was obtained. An indict-

---

2. The officers had previously been advised by appellant's wife that he might be armed. However, there was no struggle and no weapon was discovered on his person at the arrest site or in any vehicle at that site.

3. While enroute to the jobsite on the day following the discovery of the counterfeit bills, one of appellant's co–workers advised the other co–worker of the problems he had encountered that previous evening in passing the notes. Upon learning this, the co–worker jettisoned the rest of the bills in his possession. Appellant was the driver of the vehicle in which this discussion and action took place.

4. The appellant had, upon discovering 45 wet $20 federal reserve notes, distributed five notes to each of his co–workers. Later, appellant passed several bills at a bar in town and to other friends and relatives, some as gifts, some to repay debts. He also gave five bills to his wife, from whom he was living apart. Some of the notes were passed in town by the donees, and reports by various recipients triggered the state and federal investigations leading to appellant's arrest.

5. The statement reads:

"I Edward Ible was working in Royal on the 7-18-79. I am foreman for H. C. Connell Contractor for Florida Telephone. It was about 3:30 P.M. when I went into some woods to ease my bowels. I saw a piece of paper folded and wrapped with a rubber bank. I picked it up an (sic) loosed the band and I saw in it 45–$20 bills. I gave $100 to my workers, Raymond Goodyear & Nathaniel Allen–$100 to my wife Henrietta Ible, I had many drinks at Brown's Bar of which I changed 4–$20 bills, I spent one at the Seven Eleven south of Leesburg on U.S. 27. I spent one at Eastern station. I gave Rufus one. When I did change these $20 bills, the change I lone (sic) out to my friends. Before I spent these (sic) money I was told by one Charlie Mundeen that these (sic) money was not feeling real that they was wet at the time, then I dried them out and we felt them and they felt real but I still had a little idea they were false that (sic) the reason I was trying to spend them so fast.

Record, Defendant's Exhibit 2.

The underlined portion was added by appellant after the arresting state officer sought additions to the statement.

ment on two counts, possession and uttering counterfeit currency was returned upon which the appellant was found guilty by a jury of possession only and sentenced to two years imprisonment.

## II.

Before trial, appellant filed a motion to suppress all oral and written statements and all physical evidence. The trial court ruled that the appellant's arrest was a valid citizen's arrest under Florida law and thus the physical evidence and oral admissions made to the state officer were admissible. However, since the interrogating state officer did not respect appellant's request to cease further inquiry and instead sought additional admissions, the appellant's entire written statement was suppressed. The trial court also ruled that appellant's later oral statements to the Secret Service agent were free from taint, despite the circumstances warranting suppression of the written statement, and were, therefore, admissible at trial.

The case then proceeded to jury selection. During voir dire, appellant began to ask the jurors whether any of them had moral or religious beliefs about the use of alcohol that would make it difficult for them to be fair and impartial, should the issue arise.[6] The trial court, in perhaps an excess of caution, intervened before an answer could be given and told the jurors not to answer the question. The court then rephrased the question: "Will you decide the case solely under the evidence and the law without any bias or prejudice one way or another? Regardless or what scruples you might have or not have?" *Record*, vol. VI, at 39–40. Although appellant did not object to this action, it is cited as error on appeal.

During the trial of the case the precise issue upon which appellant sought voir dire, his intemperance, was brought before the jury. The appellant took the stand and on direct examination he stated that at the time he discovered the nine hundred dollars in counterfeit bills, he was experiencing financial difficulties, resulting in a housing problem for his family, and that he was happy because he could now help one of his children by purchasing medicine for sickle cell anemia. On cross examination the prosecutor sought to impeach the appellant's testimony as to his stated intent to provide for his family with the new–found money based upon his separation from his wife. The court sustained objections to this line of questioning. At that point the prosecution began a new line focusing upon appellant's spending of his weekly paycheck, as well as the counterfeit money, on the consumption of alcohol. The court limited the inquiry to general questions and confined it to the period during which the offenses charged had occurred.

Also during the trial of the case the government introduced into evidence a number of instances of the passing of counterfeit currency at local establishments by the appellant and by those to whom appellant had made gifts of the counterfeit money.[7] The trial court either instructed the jury to disregard such evidence, or in some instances allowed the evidence in to show the appellant's knowledge and intent as elements of the offense and as it might bear on the credibility of his oral admissions. The trial court denied all motions for a mistrial.

## III.

■ Whether this warrantless arrest is lawful insofar as it is not violative of the

**6.** A number of the bills had been passed for several bottles of Vodka at a bar during appellant's celebration of his discovery. The prosecutor had indicated that it would introduce evidence of this at trial.

**7.** The first instance was relevant to the Secret Service agent's involvement in the case and was not objected to at trial by appellant. The second instance was the inadvertent mention of the appellant's expenditure of money at a con-

venience store by a witness in response to a question. The trial court instructed the jury to disregard the testimony, and denied appellant's motion for a mistrial. The other incidents involved the elicitation of either the foundational reports of counterfeit money which precipitated the respective state and federal investigations, or the events which transpired between the arrest and oral admissions made at the Leesburg police station.

Constitution is determined according to controlling state law, *United States v. DiRe*, 332 U.S. 581, 583, 589, 68 S.Ct. 222, 223, 226, 92 L.Ed. 210, 214, 217 (1947), based on the particular facts involved in a given situation. When the appellant was arrested, the arresting state officers did not satisfy the requirements of Florida law in order to accomplish a lawful, out-of-jurisdiction, official arrest. *Fla.Stat.* § 901.25 (1979). However, under the common law Florida does recognize the right of a policeman as a private citizen to make an arrest (1) when a felony is committed in his presence or (2) when a felony has actually been committed and the policeman as a citizen reasonably believes, in good faith, that the person to be arrested has committed the felony. *United States v. Brown*, 551 F.2d 639, 645 (5th Cir. 1977), *rev'd en banc on other grounds*, 569 F.2d 236 (5th Cir. 1977); *Dorsey v. United States*, 174 F.2d 899, 901 (5th Cir. 1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 479, 94 L.Ed. 586 (1950). *See, e. g., McAnnis v. State*, 386 So.2d 1230, 1232 (Fla. 3rd D.C.A. 1980); *State v. Chapman*, 376 So.2d 262, 264 (Fla. 3rd D.C.A. 1979); *State v. Shipman*, 370 So.2d 1195, 1196 (Fla. 4th D.C.A. 1979); *Collins v. State*, 143 So.2d 700, 702–03 (2nd D.C.A.), *cert. denied*, 148 So.2d 280 (Fla. 1962).

■ If, as here, it is known that a felony had been committed but not in the policeman's presence, then the test for a lawful citizen arrest by a policeman out of jurisdiction is twofold: (1) whether the person making the arrest had reasonable grounds to believe that the person arrested committed the felony and (2) whether the officer making the arrest acted "under color of his office". *State v. Chapman*, 376 So.2d 262, 264 (Fla. 3rd D.C.A. 1979); *State v. Williams*, 366 So.2d 135, 136 (Fla. 2nd D.C.A. 1979). Under Florida law passing counterfeit bills and possessing ten or more counterfeit bills knowing them to be counterfeit, with the intent to pass or utter them, are felonies. *Fla.Stat.* §§ 831.07–08 (1979). The facts of the case amply support both that the arresting state officers had knowledge of the occurrence of these felonies and had reasonable grounds to believe that the

appellant had committed these felonies. Therefore, the issue becomes whether the Leesburg Police detectives acted "under color of office" and obviated the legality of the state arrest at the jobsite.

■ Florida law on this point is not free from ambiguity. *Compare, State v. Jimerson*, 330 So.2d 169, 169–70 (Fla. 4th D.C.A. 1976) (Mager, J. dissenting) *and State v. Chapman*, 376 So.2d 262, 263 (Fla. 3rd D.C.A. 1979) *with McAnnis v. State*, 386 So.2d 1230, 1232 (Fla. 3rd D.C.A. 1980) *and State v. Shipman*, 370 So.2d 1195, 1196–97 (Fla. 4th D.C.A. 1979) *and Adams v. State*, 143 So.2d 903, 904 (Fla. 2nd D.C.A. 1962). However, the weight of opinion favors defining acting "under color of office" as "a law enforcement officer actually holding himself out as a police officer, by either wearing his uniform, or in some other manner openly asserting his official position, in order to observe the unlawful activity involved or the contraband seized." *State v. Shipman*, 370 So.2d at 1196–97. *See McAnnis v. State*, 386 So.2d 1230, 1232 (Fla. 3rd D.C.A. 1980). Therefore, as the facts of this case do not show that the arresting officers acted "under color of office", we conclude that appellant's arrest was lawful and that the trial court did not err by denying appellant's motion to suppress both the physical evidence seized and the appellant's oral admissions. *See Moll v. United States*, 413 F.2d 1233, 1237–38 (5th Cir. 1969); *United States v. Montos*, 421 F.2d 215, 224–25 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970).

The appellant also contends that his oral admissions to the Secret Service agent were the tainted product of the Leesburg detective's unconstitutional conduct in obtaining a written statement from the appellant and that the trial court erred in denying appellant's motion to suppress. While it is true that the trial court suppressed the written statement because the Leesburg police detective failed to respect appellant's constitutional request to cease further inquiry, it is significant that the trial court ruled that appellant's earlier oral admission to the

Leesburg detective, which was made in the presence of the Secret Service agent, was both informed and voluntary.

It is a well established rule that subsequent in custody statements are inadmissible if a casual connection is found between the prior unconstitutional conduct and the subsequent statement. The subsequent statement is deemed to be tainted. *United States v. Henry*, 604 F.2d 908, 920–21 (5th Cir. 1979); *Harney v. United States*, 407 F.2d 586, 589 (5th Cir. 1969). However, the independent source of appellant's later oral admissions to the Secret Service agent, found in his initial oral admissions made in that agent's presence, establishes the latter's validity and the absence of taint. *United States v. Schmidt*, 573 F.2d 1057, 1062–1064 (9th Cir. 1978), *cert. denied*, 439 U.S. 881, 99 S.Ct. 221, 58 L.Ed.2d 194 (1978); *cf. United States v. Greer*, 566 F.2d 472, 474 (5th Cir. 1978), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1881, 56 L.Ed.2d 391 (1978); *United States v. Strickland*, 493 F.2d 182, 186–87 (5th Cir. 1974), *cert. denied*, 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1974). We cannot conclude that the trial court was clearly erroneous in its determination. *United States v. Llinas*, 603 F.2d 506, 508 (5th Cir. 1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *United States v. Juarez*, 573 F.2d 267, 273 (5th Cir. 1978), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed. 262 (1979).

## IV.

Appellant raises three other points as reversible error which, since we must reverse on other grounds, will not be addressed in great detail. The trial court's admission of evidence of (1) the recovery of counterfeit currency passed by appellant and his donees and (2) the search for the currency jettisoned in a beer can by appellant's co-workers, was not an abuse of discretion. *United States v. Foshee*, 606 F.2d 111, 112 (5th Cir. 1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1036, 62 L.Ed.2d 766 (1980); *United States v. Welliver*, 601 F.2d 203, 210 (5th Cir. 1979); *United States v. Ashley*, 555 F.2d 462, 465 (5th Cir. 1977), *cert. denied sub nom. Leveritte v. United States*, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977). *See* Fed.R.Evid. 403; Fed.R.Evid. 404(b). The evidence appears relevant either to appellant's knowledge and intent in regards to both the possession and uttering counts where mistake had been raised by the defense or to the motivation for, and bona fides of, appellant's statements to the arresting officers. *See United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (*en banc*), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Seay*, 432 F.2d 395, 404 (5th Cir. 1970), *cert. denied, sub nom. United States v. McGee*, 401 U.S. 942, 91 S.Ct. 949, 28 L.Ed.2d 223 (1971); *United States v. Castens*, 462 F.2d 391, 393–94 (8th Cir. 1972). Therefore we cannot conclude that the trial court abused his discretion by admitting the evidence. *See United States v. Foshee*, 606 F.2d 111, 112 (5th Cir. 1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1036, 62 L.Ed.2d 766 (1980).

In considering the appellant's contention that the government engaged in improper cross examination of the defendant, it is well settled that impeachment of a witness by presenting testimony of a general habit of intemperance unrelated to veracity is improper. *See, e. g., Poppell v. United States*, 418 F.2d 214, 215 (5th Cir. 1969). However, the record adequately demonstrates that the government intended to impeach, on cross, the veracity of appellant's statements made during direct examination and that the trial court sought to properly limit and control this attack. Since we are also confident that on retrial such impeachment, if necessary, will be conducted in a more professional manner, it is not necessary for this court to determine whether the mere asking of the questions in the form used is a sufficient basis for reversal.

Finally, the appellant submits that the effect of the denial of his proposed voir dire question concerning the jurors' moral or religious beliefs about alcohol was to deprive him of the effective exercise of his peremptory challenges. While we do not

need to decide whether this failure was reversible error, see *United States v. Shavers*, 615 F.2d 266 (5th Cir. 1980); *United States v. Delval*, 600 F.2d 1098 (5th Cir. 1979), the court views this action by the trial court with grave concern. As demonstrated by the turn of events at trial, this was a very appropriate area for inquiry by counsel and it is expected that such inquiry will be conducted on retrial.

■ While Federal Rules of Criminal Procedure 24(a) gives wide discretion to the trial court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the court[8] does not take into account the fact that it is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case. "Peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes." *United States v.*

*Ledee*, 549 F.2d 990, 993 (5th Cir. 1977), *cert. denied*, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977). *See United States v. Price*, 573 F.2d 356, 362 (5th Cir. 1978); *United States v. Mutchler*, 559 F.2d 955, 958–60 (5th Cir. 1977). Therefore questioning by the court must overall, coupled with its charge to the jury, afford a party the protection it seeks. *United States v. L'Hoste*, 609 F.2d 796, 802–03 (5th Cir. 1980) (appeal pending); *United States v. Delval*, 600 F.2d 1098, 1102–03 (5th Cir. 1979); *United States v. Williams*, 573 F.2d 284, 287 (5th Cir. 1978). Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfil this need than an exclusive examination in general terms by the trial court.

## V.

■ We reach appellant's contention that the government failed to comply with Federal Rules of Criminal Procedure 16(a)(1)(A)[9], and find that it has merit.[10]

8. During the past fifteen to twenty years there has been a trend by federal district judges to conduct the voir dire questioning themselves. Such a course was a result of many abuses by counsel including the consumption of excessive time periods and delving into improper areas during voir dire examination. More recently, records reviewed in this court reflect a new pattern by trial courts. The trial judge will explain the nature of the case in general terms, point out the parties and counsel, cover the most basic points of law (burden of proof, presumption of innocence, right to remain silent, etc.), explain the procedures and schedule to be followed and then turn the questioning over to trial counsel. We encourage this approach. Trial judges have a duty to control this and every other aspect of the trial, but all proper areas of inquiry must be covered fairly. The trial judge in this case was following this procedure prior to rephrasing counsel's question.

9. **Rule 16. Discovery and Inspection**

(a) *Disclosure of Evidence by the Government*.

(1) **Information Subject to Disclosure.**

(A) **Statement of Defendant**. Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; *the substance of any*

oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged. Where the defendant is a corporation, partnership, association or labor union, the court may grant the defendant, upon its motion, discovery of relevant recorded testimony of any witness before a grand jury who (1) was, at the time of his testimony, so situated as an officer or employee as to have been able legally to bind the defendant in respect to conduct constituting the offense, or (2) was, at the time of the offense, personally involved in the alleged conduct constituting the offense and so situated as an officer or employee as to have been able legally to bind the defendant in respect to that alleged conduct in which he was involved.

(emphasis added).

In response to appellant's Motion for Discovery and Inspection and for Favorable or Exculpatory Evidence, dated September 6, 1979, paragraph 2a, requesting "the substance of any oral confessions, statements, or admissions ... ", the government stated in its response, dated September 17, 1979, that it had "No opposition. There are oral admissions only, which will be supplied, in substance, by a

10. See note 10 on page 396.

Prior to trial the government provided defense counsel with the appellant's written statement [11] and indicated that this document contained the substance of appellant's oral admissions made to the interrogating officers which would be submitted in evidence at trial. In this statement, which was later suppressed, the appellant admitted "[B]efore I spent these money I was told that these money was not feeling real that they was wet at the time, then I dried them out and we felt them and they felt real but I still had a little idea they were false that the reason I was trying to spend them so fast." [12]

During the government's case–in–chief, the following testimony was given by the arresting Secret Service agent:

Q. Did Mr. Ible then make any statements?

A. Yes, he did.

Q. What did he say?

A. He stated that he knew the money was counterfeit. He stated that the day before he had been told that the money was funny money, and that he should take it to someone to have it

verified. He stated that he had knowledge of counterfeit money because he had been a police officer in the British West Indies where he had been trained and knew about the Queen's money being counterfeit."

*Record*, vol. VIII, at 276–77.

There is a significant difference between this testimony and the statements provided the defense counsel as the substance of appellant's oral admissions. The latter is a confession to the most critical elements of the offense in dispute at trial, knowledge and intent, whereas the former reflected a state of awareness which at least arguably does not rise to the level of criminal intent. *See, e. g., United States v. Manetta*, 551 F.2d 1352, 1356 (5th Cir. 1977). While the prosecutor was candid with this court in admitting surprise,[13] his efforts to demonstrate that this testimony was based upon admissions previously made to the state arresting officer and thus not new, were unavailing.[14] This statement was clearly discoverable under Rule 16(a)(1)(A). *See United States v. Pascual*, 606 F.2d 561, 565 (5th Cir. 1979); *United States v. Campag-*

---

separate written document. There are no confessions."

**10.** A full review of the record shows that appellant's additional contention that the trial court failed to rule on the voluntariness of appellant's confession to the Secret Service agent in accordance with 18 U.S.C. § 3501(a) is absolutely without merit.

**11.** *See* note 5 *supra*.

**12.** *Id.*

**13.** In view of the surprise it is possible that the Secret Service agent did not comprehend the significance of his testimony. It is expected that whether the testimony was an accurate recital of appellant's remarks to the arresting federal officer or a restatement by the agent in his own words will be a point of prosecutorial and defense investigation. In any event at this stage, even if the testimony was due to a misunderstanding on the agent's part, the agent's conduct must be imputed to the government. *Cf. Freeman v. State*, 599 F.2d 65, 69 (5th Cir. 1979), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980).

**14.** The following testimony took place after denial of appellant's motion for a mistrial:

Q. All right. Later that afternoon, Agent Converse, did you arrest Mr. Ible?

A. Yes, sir, I did.

Q. And did he tell you anything?

A. Yes, sir.

Q. What did he say?

A. He stated again–I asked him then did you know–you knew this money was counterfeit. And he said yes, that was one of the reasons why he was trying to get rid of it, or try to spend it so fast, trying to spend the money so fast. He stated–I asked him about the training that he might have as far as counterfeit money. And he stated that he was–he had been trained in the detection of the Queen's money. And again, he stated the part about Mr. Munden who had told him the day before that he had been told by someone else that he thought the money was counterfeit.

*Record*, Vol. VIII, at 281–82. This testimony indicates that the witness was testifying as to admissions made during a second separate interrogation from that which led to the suppressed written statement. This document being the only one supplied to the defense under Rule 16(a).

*nuolo,* 592 F.2d 852, 858 (5th Cir. 1979); *United States v. Arcentales,* 532 F.2d 1046 (5th Cir. 1976).

While a failure to comply with Rule 16(a) is not reversible error in the absence of a showing of prejudice, *United States v. Arcentales,* 532 F.2d 1046 (5th Cir. 1976), we are mindful that the most critical issue in this close case [15] was appellant's knowledge and intent. We conclude that the error, therefore, was of a prejudicial nature. In making this determination, we look to Justice Rutledge's classic formulation in *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946):

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand .... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*See also, United States v. Jennings,* 527 F.2d 862, 868 (5th Cir. 1976). We are not convinced that the error in this case might not have had a substantial influence on the jury. The judgment of the District Court is REVERSED and the matter REMANDED for a retrial.

RONEY, Circuit Judge, specially concurring:

I concur with Judge Fay's opinion except as to his remarks about the method of conducting examination of prospective jurors. Regardless of my own predilections concerning voir dire, I have long held the view that appellate courts should affirm or reverse district court judgments in criminal trials, and not advise the district judges on how to exercise discretion vested in them by the statutes and the rules. Federal Rule of Criminal Procedure 24(a) explicitly gives the district court permission to let the attorneys conduct the examination of prospective jurors or to "itself conduct the examination." Different trial judges have different ideas about how this discretion should be exercised. The Judges of the Fifth Circuit are not in accord. Lawyers seem generally opposed to the rule which gives such discretion to the trial court. But the rule is there, and assuming its legality, district judges should be able to operate under it without advice from the appellate court. If the district court exceeds the bounds of discretion given it, we should reverse. If not, we should affirm.

If a point on review is close, an opinion suggesting such closeness may tend to set the bounds of the law and assist courts in future trials. Such is not the case with the conduct of voir dire by the court. I see no possibility that this Court will ever reverse a criminal conviction merely because the district court has itself conducted the examination of prospective jurors to the exclusion of the attorneys, assuming compliance with the rest of the rule and the cases decided thereunder. In other councils, we may individually participate in the continuing debate as to the propriety of various methods of voir dire examination, but at this time the appellate court, as such, has no place in that controversy.

Therefore, regardless of my own views about the matter, I decline to join an opinion of the Court which purports to take sides in that debate.

JAMES C. HILL, Circuit Judge, specially concurring:

I concur in the opinion by Judge Fay for our panel except for the observations in it

---

**15.** We note that the jury was out for a day and a half, that the trial court gave a modified *Allen* charge, and that the appellant was acquitted on the uttering count. This is a significantly different situation than was addressed by the court in *United States v. Arcentales,* 532 F.2d 1046 (5th Cir. 1976). In this regard also see *United States v. Manetta,* 551 F.2d 1352 (5th Cir. 1977).

referred to by Judge Roney in his special concurrence. As to them, I agree with both of may colleagues and concur in the resolution of any issue presented with Judge Roney.

I find that my personal preferences clash with what I conceive to be my judicial function. A special concurrence permits me, I trust, the luxury of pointing out the former.

From my personal experience as a trial lawyer and district judge I conclude, as does Judge Fay, that voir dire should, except in unusual situations, be conducted by the attorneys who are to try the case. In the case before us, counsel's familiarity with the case made him alert to the need to excuse prospective jurors whose feelings would be adverse to one given to overindulgence in alcohol. The trial judge did not appreciate the need for what then appeared somewhat unrelated to a counterfeit money case. Defense counsel should have been permitted to find out the jurors' attitudes towards drinking—even those on the panel who sincerely felt that they would, at all events, decide the case properly.[1]

Yet, whatever be my feelings in the matter, the law is clear. Rule 24(a) Federal Rules of Criminal Procedure gives the district judge the right and the responsibility of conducting the voir dire or of having it conducted by counsel. Bound as we are to apply the law to the case before us, we cannot conclude that there was anything wrong with this trial solely because the trial judge exercised this right and assumed this responsibility. When the judge does elect to conduct the voir dire, it should be as complete as if it had been *properly* done by trial counsel.

---

1. Perhaps my personal preference derives from my having practiced with and conducted trials by members of a fine bar. Seldom have I seen the abuse of voir dire by lawyers described to me by other judges in other places.