UNITED STATES of America, Plaintiff,

v.

Richard COLLINS, Dennis R. Hatcher, Ken E. Dampier, and William Keene, Defendants.

No. 81–262–Cr–SMA.

United States District Court,
S. D. Florida,
Miami Division.

Sept. 21, 1981.

Atlee Wampler, III, U. S. Dist. Atty., S. D., Miami, Fla., Gregory Weiss, Asst. U. S. Atty., for plaintiff.

Bierman, Sonnett, Beiley & Shohat, P. A. by Benedict P. Kuehne, Miami, Fla., Robert Hagaman, Naples, Fla., for defendants.

## ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS

ARONOVITZ, District Judge.

THIS MATTER was heard by the Court in an evidentiary hearing upon the Defendants' Motion to Suppress the physical evidence seized from aboard the M/V McRICH at the time the four Defendants were arrested. Defendants assert that the arresting officers had no jurisdiction or authority to make the stop and search of the American flag vessel or to arrest them. A two count indictment charges Defendants with possession with intent to distribute a quantity of marijuana and with conspiracy to possess with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. §§ 955a(a) and 955(c). The Court, having considered the testimony and other evidence adduced at the hearing, having heard oral argument from counsel, having considered the respective memoranda of law and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On February 25, 1981, Florida Marine Patrol (FMP) Officers Mike Minski and Andy Brown, along with Officer Ronald Dearmin of the National Oceanic and Atmospheric Administration, United States Department of Commerce, were patrolling off the west coast of Florida near Everglades City, Florida (Collier County) aboard the 50 foot Florida Marine Patrol vessel ORION within a fisheries conservation zone along a line of demarcation between designated stone crab bed areas and authorized shrimping areas as established by the Department of Commerce. The purpose of the officers' presence in the area was to enforce federal regulations prohibiting shrimping vessels from casting their trolling nets within the stone crab bed area. The line of demarcation runs along the west coast of Southern Florida at distances from the shore varying up to 200 miles. 50 C.F.R. § 654.23(a).

At approximately 6:00 that night two contacts were picked up on the ORION'S radar which appeared to be shrimping vessels crossing into the stone crab bed area. The ORION weighed anchor and proceeded to intercept the vessels to determine if they were engaging in illegal shrimping activity. At the time the vessels were first spotted on radar they were approximately 18 miles from shore traveling in a northeasterly direction toward Everglades City, Florida. When the ORION, running without lights, approached the two vessels, Officer Minski turned the ORION'S spotlight on one of the vessels, later determined to be the MISS JILL II, and observed burlap wrapped bales stacked on her deck. At this point, the MISS JILL II veered away while the other vessel continued on its previous course. The ORION pursued the MISS JILL II and after a short chase effected a stop, and

arrested her four occupants at about 10:00 P.M. Three of these individuals were transferred to the ORION while the fourth, the captain, was left on board the MISS JILL II along with Officer Brown.

Thereafter, the ORION proceeded after the other vessel which had been traveling with the MISS JILL II. During the course of stopping and securing the MISS JILL II the other vessel had gone off the radar, so the ORION proceeded in the direction that vessel had been headed when last seen. The ORION first ran down a contact which turned out to be a sailboat. The ORION then began pursuing a second contact. As it closed to within 25–50 feet of the vessel, Officer Minski turned his spotlight on the vessel revealing burlap wrapped bales stacked in the open cabin up to the roof and on the work deck. The vessel bore on its stern the name "McRICH" and listed its home port as Everglades City, Florida. Officer Minski turned on his blue revolving light, identified himself over the loud hailer as a FMP officer and ordered the McRICH to stop at about 11:00 P.M. The McRICH first attempted to elude the ORION by increasing its speed and by making evasive maneuvers, but finally stopped when Officer Dearmin fired a shotgun blast over the vessel. The ORION was then brought alongside the McRICH and Officer Minski ordered the five occupants of the McRICH, which included these four Defendants, to come aboard the ORION. The McRICH was tied to the ORION and taken in tow. After rendezvousing with Officer Brown and the MISS JILL II, the vessels proceeded to Key West. At no time did Officer Minski or Officer Dearmin actually board the McRICH prior to landing in Key West.

Officer Minski testified that the McRICH was stopped 5½ to 6 miles off the Florida coast. This testimony was based upon his recollection of the distance indicated by the radar readings of the shoreline at the time of the arrest. However, the log of his radio transmissions during the course of this incident contains Loran coordinates which indicate that the McRICH was stopped well outside Florida territorial waters. Officer Minski further testified, however, that be-

cause of distance and adverse atmospheric conditions that night, he was unable to establish direct radio communications between the ORION and her home base in Naples, Florida. He was able to contact the FMP station at Key West which then *relayed* his messages to Naples. Under these circumstances, it is very likely that there was an error made in relaying or recording the Loran coordinates, which are expressed as two sets of a series of six numbers. In fact, Officer Minski testified that the relayed position plotted pursuant to the Loran coordinates contained in the radio log was nowhere near the area where the arrest was made. This Court concludes that Officer Minski's independent recollection of his position based on his radar observations is the more credible evidence of how far from the shore they were at the time the McRICH was stopped. This finding is made after careful evaluation of the witness' manner of testifying, his apparent candor, and his first-hand knowledge of the facts.

## CONCLUSIONS OF LAW

Defendants argue the marijuana seized aboard the McRICH should be suppressed because at the time of the arrest the officers were outside of Florida's territorial waters and therefore had no authority or jurisdiction to stop and search the vessel or to make an arrest. It is not clear whether Defendants contend the evidence should be suppressed as the result of an illegal search or as the "fruit" of an illegal arrest, however it is the conclusion of this Court that neither theory entitles the Defendants to the relief sought.

█ Addressing first the question of an illegal search, this Court concludes that Defendants have failed to establish the requisite legitimate expectations of privacy in the area searched in order to raise a Fourth Amendment challenge to admission of the evidence. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Ra-*

*kas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). There was no testimony that any of the Defendants had owned, leased or chartered the vessel or had any other proprietary interest therein. Moreover, the marijuana bales were not located in any area of the vessel which could be considered private as to any individual, but rather, were stacked out in the open on the McRICH'S work deck and in her wheelhouse. "There can be no legitimate expectation of privacy in those areas of a commercial vessel which are subject to the common access of those legitimately aboard the vessel." *United States v. DeWeese,* 632 F.2d 1267, 1271 (5th Cir. 1980).

Even if Defendants were able to establish a legitimate expectation of privacy, it is clear that the search of the vessel could in no way be characterized as illegal. Defendants acknowledge that pursuant to 14 U.S.C. § 89(a) or 19 U.S.C. § 1581(a), Coast Guard or Customs officers, respectively, could have stopped and boarded the McRICH in either United States or international waters. Defendants assert, however, that FMP or Department of Commerce officers have no authority to exercise those broad powers exclusively vested by Congress in the Coast Guard and Customs Service, citing *United States v. Thompson,* 475 F.2d 1359 (5th Cir. 1973), and therefore possessed no authority to stop and search the McRICH in international waters.

Although recognizing the nature of the question raised, this Court has found that the McRICH was stopped within Florida's territorial waters and not in international waters as Defendants suggest. Article II, section 1(a), of the Florida Constitution provides that the state boundary lies three marine leagues, or approximately nine geographic miles, seaward of the Gulf of Mexico coastline, as originally established by the Florida Constitution of 1885. This would include the area where the McRICH was stopped. Defendants contend that Florida only has sovereignty, including general law enforcement authority, up to three geographic miles from the coast and that in the area extending from three to nine geo-

graphic miles Florida has only limited jurisdiction over natural resources in the sea bed, *see,* 43 U.S.C. § 1331, and concurrent jurisdiction with the United States as to fisheries matters. *See United States v. Florida,* 425 U.S. 791, 96 S.Ct. 1840, 48 L.Ed.2d 388 (1976); *United States v. Florida,* 420 U.S. 531, 95 S.Ct. 1162, 43 L.Ed.2d 375 (1975). However, the Florida Constitution makes no such distinction, nor would recognition of Florida sovereignty for purposes of general law enforcement in the area from three to six miles off the Gulf Coast be inconsistent with United States or international law, particularly where, as here, Defendants are all citizens of Florida. In *Skirotes v. Florida,* 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941), the Supreme Court upheld the Appellant's conviction for using diving equipment in the taking of sponges from the Gulf of Mexico "at a point approximately two marine leagues [six geographic miles]" from the Florida coast, in violation of Florida law. *Id.* at 70–71, 61 S.Ct. at 926. There too, Appellant argued that the criminal jurisdiction of Florida could not extend beyond a three mile limit recognized as the international boundary of the United States, and that the state boundary as fixed by the Florida Constitution violated the Constitution and treaties of the United States. *Id.* at 71, 61 S.Ct. at 926. Because Appellant was a Florida citizen whose prosecution involved only domestic rights and duties rather than questions of international relations, arguments based on the territorial limits of United States waters were regarded as irrelevant. Noting that "there is nothing novel in the doctrine that a State may exercise its authority over its citizens on the high seas," the Court concluded ". . . we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." *Id.* at 77, 61 S.Ct. at 929. For the same reason, Appellant was not considered to be in a position to invoke the rights of foreign citizens or governments pursuant to international treaties. Similarly, in the instant

matter, Defendants are Florida citizens whose prosecutions involve purely domestic concerns in which the State of Florida certainly has a legitimate interest: the curtailment of the entry of marijuana into the state. No conflict with international law or relations nor with any act of Congress has been shown. In fact, as evidenced by this prosecution, the state involvement here has been in furtherance of the laws of the United States. Therefore, Florida was entitled to exercise its criminal jurisdiction, under the circumstances of this case, to the full extent of its boundaries as defined by the Florida Constitution.

■ There is another, and more basic, reason why the officers' actions cannot be characterized as an illegal search: in fact, no "search" was made by the officers at the time of arrest. The marijuana bales were sitting in the open on the McRICH'S deck, in plain view of the officers aboard the ORION, under the illumination of her spotlight. No search of the vessel was required to discover the marijuana, and, in fact, the uncontroverted testimony established that neither Officer Minski nor Officer Dearmin even boarded the McRICH until after she had been towed to Key West. This also disposes of the Defendants' arguments that neither officer was authorized to exercise the more expansive statutory search powers provided by 14 U.S.C. § 89(a) or 19 U.S.C. § 1581(a) to the Coast Guard and Customs Service, respectively. Because the marijuana was in plain view, the officers had no need to, nor did they in fact, exercise these special statutory powers to search vessels on the high seas. The plain view sighting of the marijuana bales and the McRICH'S attempt at flight after Officer Minski identified himself were more than sufficient probable cause to stop and seize the McRICH.

■ As previously noted, Defendants also argue that the evidence should be suppressed as the "fruit" of an illegal arrest because the officers were acting outside their jurisdiction. As discussed *supra*, it is the conclusion of this Court that the State does possess general law enforcement au-

thority, under these circumstances, within the boundaries defined by the Florida Constitution. Inasmuch as there was also sufficient probable cause to make the arrest, this contention has no merit. Furthermore, under *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), and their progeny, Defendants may not challenge this Court's jurisdiction over their persons on the grounds that their presence was unlawfully secured. *See United States v. Cadena*, 585 F.2d 1252 (5th Cir. 1978); *United States v. Winter*, 509 F.2d 975 (5th Cir. 1975). *Cf. United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974).

■ However, even if the officers were acting outside their jurisdiction, the arrest would still be valid. Generally, where a law enforcement officer makes an arrest outside of his geographic area of jurisdiction he is deemed to be acting as a private citizen and a Federal Court looks to the law of the state in which the arrest occurred to determine if the action can be upheld as a citizen's arrest. *United States v. Ible*, 630 F.2d 389 (5th Cir. 1980); *United States v. Brown*, 551 F.2d 639 (5th Cir. 1977); *United States v. Bishop*, 530 F.2d 1156 (5th Cir. 1976). Florida follows the common law rule recognizing the right of a police officer to make a citizen's arrest (1) where a felony is committed in his presence or (2) when a felony has actually been committed and the police officer as a citizen reasonably believes, in good faith, that the person to be arrested has committed the felony. *Ible* at 393. Of course, if this arrest is deemed to have been made outside state boundaries, Florida law would not be controlling. Where, as here, however, there is no specific federal law to govern this situation, a federal court may resort to and apply the common law. *United States v. Crain*, 589 F.2d 996 (9th Cir. 1979); *United States v. Best*, 573 F.2d 1095 (9th Cir. 1978). Applying the common law rule to the facts of this case it is clear that the arrest was valid and lawful as a citizen's arrest. Upon approaching the McRICH and turning their spotlight on the vessel the officers immediately saw the

bales of marijuana on deck and the home port designation of Everglades City, Florida, establishing the commission of a felony in the officers' presence. Thus, there is no basis for suppression of the evidence on the theory of an illegal arrest.

## CONCLUSION

In conclusion, it is the opinion of this court that Defendants did not possess the requisite legitimate expectations of privacy in the area searched to raise a Fourth Amendment challenge to the introduction of the evidence seized from aboard the McRICH. In any event, however, no illegal search of the McRICH was made by the arresting officers inasmuch as the marijuana bales were in plain view of the officers aboard the ORION as they approached the McRICH and therefore, no "search" was made. Nor can the arrest of the Defendants by FMP officers at a point approximately six miles off the west coast of Florida be considered illegal. Florida may properly exercise its general law enforcement authority over its citizens to the full extent of its territorial boundaries, as defined by the Florida Constitution, where there is no conflict with international law or relations or with any act of Congress. Alternatively, if the arrest is considered to have been made outside the officers' jurisdiction, the arrest is valid as a common law citizen's arrest. Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motion to Suppress be, and the same hereby is, DENIED.