**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 90-1348
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CHRISTOPHER BARRY GREER, DANIEL ALVIS WOOD,
SEAN CHRISTIAN TARRANT, MICHAEL LEWIS LAWRENCE,
and JON LANCE JORDAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____
(July 30, 1992)

Before POLITZ, Chief Judge, GOLDBERG, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, and DEMOSS, Circuit Judges.

PER CURIAM:

This case was taken en banc to review issues concerning jury selection discussed in part II of the panel opinion. See United States v. Greer, 939 F.2d 1076, 1084-86 (5th Cir.), vacated for rehearing en banc, 948 F.2d 934 (5th Cir. 1991). Except as to part II, we reinstate the panel opinion. As relates to the issues in part II, the court unanimously holds that the district court did not err in refusing to strike for cause all blacks, Hispanics, and Jewish jurors. Otherwise, as a consequence of an

equally divided court the actions and decisions of the district court, as discussed in part II, and the convictions are AFFIRMED by operation of law.[1]


JERRY E. SMITH, Circuit Judge, with whom GOLDBERG, KING, DUHÉ, WIENER, BARKSDALE, AND EMILIO M. GARZA, Circuit Judges, join, would affirm the district court for the following reasons:


I.

At trial, the defendants requested that the court strike for cause all black, Hispanic, and Jewish prospective jurors.[2] Defendants also requested that all prospective jurors be asked whether they are Jewish. The court refused both requests. We have chosen to review en banc only the court's conduct of voir dire.

The defendants contend that they were denied the right to a fair and impartial jury. They maintain that the district court erred in (1) not excluding all black, Hispanic, and Jewish citizens for cause from the panel of prospective jurors because they were intended victims of the alleged offenses; (2) failing to examine potential jurors regarding racial and ethnic bias so that defendants could exercise their peremptory challenges intelligently; and (3) refusing to require Jewish prospective jurors to identify themselves as such. We disagree with each of

---

[1] "An affirmance by an equally divided court . . . has no precedential value, see generally Hertz v. Woodman, 218 U.S. 205, 213-14, 30 S. Ct. 621, 622-23, 54 L. Ed. 101 (1910) . . . ." Lacy v. General Fin. Corp., 651 F.2d 1026, 1028 (5th Cir. Unit B July 1981).

[2] For a full exposition of the facts, see the panel opinion in this case.

these contentions and conclude that the defendants were not denied a fair and impartial jury.

## A.

The district court correctly decided not to exclude for cause all black, Hispanic, and Jewish citizens from the panel of prospective jurors. The indictment charges defendants with conspiring against black, Hispanic, and Jewish citizens of the United States. The defendants argue that all black, Hispanic, and Jewish persons should have been excluded from the jury because they were the intended victims of the offense.

We are unwilling to hold that all members of the victims' racial or religious class necessarily should be excluded in every hate crimes case in which the classes are broadly described.[3] Absent a showing of individual bias, a court does not abuse its discretion when it refuses to exclude for cause an otherwise qualified class of jurors. See Smith v. Phillips, 455 U.S. 209, 215-17 (1982). Indeed, in a factually similar case, the Fourth Circuit upheld a district court's refusal to strike for cause all prospective black jurors when the defendant was an alleged white supremacist. Person v. Miller, 854 F.2d 656, 665 (4th Cir. 1988), cert. denied, 489 U.S. 1011 (1989). Instead, the court

---

[3] The defendants argue that the indictment is framed in such a way as to make all black, Hispanic, and Jewish citizens intended victims. Assuming, arguendo, this reading of the indictment, we are not prepared to hold that such a universal victim status constitutionally mandates the exclusion of all potential jurors in those categories. Instead, the pertinent question is whether the respective members of such a universally-described victim class harbor any bias. That determination, in turn, is a prime function of voir dire examination.

allowed each individual juror to be questioned for bias.  Id.[4]

B.

The court adequately questioned the venire regarding potential bias against the defendants.[5]  The district court has broad discretion in determining how best to conduct voir dire and in deciding whether to excuse a juror.  Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981); Fed. R. Crim. P. 24(a).  "We grant broad discretion to the trial judge in making determinations of impartiality and will not interfere with such decisions absent a clear abuse of discretion."  United States v. Hinojosa, 958 F.2d 624, 631 (5th Cir.  1992) (citations omitted).

The test for determining whether a court has adequately questioned prospective jurors regarding bias is whether "the means employed to test impartiality have created a reasonable assurance that prejudice would be discovered if present."  United States v. Saimiento-Rozo, 676 F.2d 146, 148 (5th Cir. 1982).  A court abuses its discretion when the scope of voir dire is inadequate to discover bias and deprives the defendant of an opportunity to make reasonable use of peremptory challenges.  See United States v. Brown, 799 F.2d 134, 136 (4th Cir. 1986).

_____

[4] See also In re City of Houston, 745 F.2d 925, 930 (5th Cir. 1984) (where the judge in a class action suit is a member of the class, recusal is not appropriate where the judge's interest is not "direct or immediate but remote or contingent").

[5] Although defendants characterize potential bias against them as "racial bias," and the dissenting opinion makes repeated reference to "racial bias" and "racial prejudice," see, e.g., slip op. at 9, 10, 11, 13, 15, 16, 17, the defendants do not seriously contend that jurors would be prejudiced against them because they were white.  Therefore, the district court properly focused on moral and ideological, not racial, bias.

Failure to question individual jurors about facts or experiences that might have led to bias does not necessarily indicate that voir dire was constitutionally insufficient. Mu'Min v. Virginia, 111 S. Ct. 1899, 1908 (1991).

The court in this instance adequately inquired into the potential jurors' possible biases against the defendants. The court used three methods to probe bias: an individual questionnaire, group voir dire, and individual voir dire. An examination of the court's methods show that the Saimiento-Rozo standard was satisfied.

First, each prospective juror filled out a questionnaire asking for information regarding, inter alia, his or her occupation; his or her spouse's occupation; whether he or she regularly attended "church, temple, or other religious services"; whether he or she held "any offices in a church, temple, or religious organization" and, if so, what the office was; membership in any fraternal, social, professional or public service organizations; military service; and whether he or she had "heard or read" anything about the vandalism of Jewish properties, the incidents in the park, skinheads, or skinheads' involvement in any of the incidents.

Next, the court conducted group voir dire. It explained the indictment and the presumption of innocence to the venire panel and asked whether the prospective jurors could follow the instructions. Three persons answered that they had heard too much about the case to abide by the presumption of innocence;

5

only two were identified in the transcript, both of whom eventually were struck for cause. After a number of standard questions, the court asked whether any person knew anyone in the Hammerskins or was a member of a racial supremacist group.

The court then asked,

> Should the evidence show that the Confederate Hammerskins are a group which advocates white supremacy and that the Defendants are members of such a group SQ and I say should because you don't have any evidence before you at this time SQ could you give each of the Defendants the same presumption of innocence and the same benefit of following only the evidence adduced in court and the instructions or law that the Court gives you without any kind of bias or prejudice or sympathy or fear? [Emphasis added.]

Two jurors answered yes and eventually were struck for cause. The court then asked,

> The charges in the indictment, and I repeat again that the indictment is just a charge and it is not evidence of any kind, legend and substance [sic, allege in substance?] that the Defendants acted to interfere with the constitutional protected rights of other persons because of their race or color or national origin. The Government may put on evidence to demonstrate the Defendants' racial beliefs. However, I instruct you that the Defendants are not on trial for their racial beliefs, whether you agree with those beliefs or don't agree with those beliefs. Now, is there anyone who could not follow that instruction? [Emphasis added.]

> [no response]

> There is this second instruction. You can use evidence of the beliefs of a Defendant to help decide whether the Defendant may have acted or may have been motivatedd [sic] to act in accordance with those beliefs but you are here as jurors only to judge matters under the Charge and not whether a Defendant believed in such and such a way, had a belief. Whether he acted is what you will be talking about. Anybody who can't follow that sort of instruction? [Emphasis added.]

6

[no response]

Finally, the court briefly questioned each of the fifty-three prospective jurors individually.[6]  It asked what, if anything, he or she had read or heard about the case.  The court also asked each juror whether he or she could be impartial and could reach a decision based only upon the evidence in the case.

The individual questioning elicited admissions of bias.  At least thirteen persons expressed hesitation as to whether they could be impartial.  Several of these potential jurors expressed grave misgivings regarding whether they could be fair and variously referred to the defendants by such terms as "Nazis," "racists," "bigots," and "vandals."  The responses provided defendants with sufficient information to exercise their peremptories intelligently;  none of these persons served on the jury.  Further questioning directed at such bias would have been only cumulative, and, while it might have been appropriate, it was not constitutionally required.

### C.

The court did not abuse its discretion in not requiring Jewish veniremembers to identify themselves.  The issue is whether sufficient questions were asked to ferret out any bias, not whether specific questions were asked.  The voir dire and

---

[6] Contrary to defense counsel's representation at en banc oral argument, every veniremember who had not been struck for cause was questioned individually.  Accordingly, and contrary to the implication of the dissenting opinion, slip op. at 6, the individual questioning was not limited to "each individual juror who had answered yes on the questionnaire as to whether they had read or heard any press reports about the case."

jury questionnaire constituted an adequate alternative and, as discussed _supra_, provided defendants with the opportunity to make reasonable use of their peremptory challenges.

Nor was the identification of the religion of the jurors constitutionally mandated.[7]  This is so because "[t]o be constitutionally compelled . . ., it is not enough that . . . [particular] questions might be helpful [in assessing juror bias or in exercising peremptory challenges]."  _Mu'Min_, 111 S. Ct. at 1905 (1991) (state habeas corpus case) (citing _Murphy v. Florida_, 421 U.S. 794, 799 (1975)).

In _Mu'Min_, the Supreme Court recently reiterated, _id._ at 1904, that a trial court "retains great latitude in deciding what

---

[7] We do not address whether such a question would be constitutionally permissible.  Citing, _inter alia_, _Edmonson v. Leesville Concrete Co._, 111 S. Ct. 2077, and _Batson v. Kentucky_, 476 U.S. 79 (1986), the panel, 939 F.2d at 1085, opined that the question regarding Jewish identification was constitutionally proscribed.  Confining ourselves to whether the questions that were asked adequately protected the defendants (and thus to the question of whether the question on Jewish status is constitutionally required), we do not reach the issue of the applicability of _Batson_ and _Edmonson_.

We note, however, that subsequent to en banc oral argument in this case, the Supreme Court issued its opinion in _Georgia v. McCollum_, 60 U.S.L.W. 4574 (U.S. June 18, 1992).  There, the Court, in accordance with the view taken by the panel in this case, 939 F.2d 1086, and stridently opposed by the instant defendants and amicus curiae, now has held squarely that the _Batson_ rationale applies to the exercise of peremptory strikes by _defendants_ in criminal cases.  _Id._ at 4576.  In emphasizing the requirement of eliminating "race stereotypes" from the jury selection process, the Court noted that "[t]he need for public confidence [in that process] is especially high in cases involving race-related crimes."  _Id._

In _McCollum_ the Court also recognized "that denying a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror.  _Id._ (citing _Strauder v. West Virginia_, 100 U.S. 303, 308 (1880)).  This calls into question the statement in the dissent that "[t]his is a three-cornered play of prosecutor, judge, and defense counsel SQ _three_ players, not one."  Slip op. at 21.  To these three actors must be added a fourth: the prospective juror who is subject to discrimination on some invidious ground.  We also conclude that _Morgan v. Illinois_, 112 S. Ct. 2222 (1992), decided only three days before _McCollum_ and relied upon in the dissent, has no direct bearing on the case _sub judice_, as it involves the narrow question of whether, in a capital case, jurors must be asked whether they "would automatically impose the death penalty upon conviction of the defendant."  _Id._

8

questions should be asked on <u>voir dire</u>." Specifically as it applies to the instant case, the Court observed the following:

> <u>Voir dire</u> examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. In [<u>Aldridge v. United States</u>, 283 U.S. 308, 51 S. Ct. 470, 75 L.Ed. 1054 (1931), and <u>Ham v. South Carolina</u>, 409 U.S. 524, 93 S. Ct. 848, 35 L.Ed.2d 46 (1973),] we held that the subject of potential racial bias must be `covered' by the questioning of the trial court in the course of its examination of potential jurors, but we were careful not to specify the particulars by which this could be done. We did not, for instance, require questioning of individual jurors about facts or experiences that might have led to racial bias.

<u>Id.</u> at 1908. Where, as here, the court has inquired adequately into the jurors' possible biases, that is, in a manner reasonably calculated to identify any bias, the failure to require that the prospective jurors of a particular religion identify themselves does not constitute an abuse of discretion nor render the trial constitutionally suspect.


## II.

The en banc court is in agreement that all but part II of the panel opinion, and that portion of part II that holds that the district court did not err in refusing to strike for cause all black, Hispanic, and Jewish prospective jurors, should be reinstated. For the foregoing reasons, we would affirm as well on the question of whether the conduct of voir dire deprived the defendants of a fair and impartial jury.

HIGGINBOTHAM, Circuit Judge, with whom POLITZ, Chief Judge, and GARWOOD, JOLLY, DAVIS, JONES, and DEMOSS, Circuit Judges, join, would reverse the judgments of conviction for the following reasons:

This is the opinion that we think the court should have adopted. Recent decisions by the Supreme Court have sharply curtailed the trial lawyer's traditional reliance on intuition and stereotypes in jury selection. Peremptory challenges are often no longer peremptory. Rather, trial lawyers must offer reasons. The Supreme Court has--almost with the same pen--insisted on a criminal defendant's constitutional right to an adequate voir dire. The combination casts a pall over increasingly limited voir dire of jurors in federal courts. These practices cannot continue. Both the prosecution and defense are entitled to a full probing of the venire. The trial judge must tailor the examination of the venire to the case, unrelentingly insisting on an adequate examination. That did not happen here--as we will explain.

### I.

This is an appeal of convictions by a jury in Dallas, Texas of charges of conspiring to deprive black, Hispanic, and Jewish citizens of rights secured to them under the Constitution and laws of the United States, in violation of 18 U.S.C. § 241. A panel of this court affirmed the convictions, rejecting numerous assertions of error. We granted rehearing en banc to consider whether the district court erred in refusing to explore the issue

10

of racial bias at voir dire and to inquire whether members of the venire were Jewish.  We find no merit in defendants' other points of error,  but we would find that the restricted voir dire deprived the defendants of their Sixth Amendment rights by creating an unacceptable risk that the jury was biased, and reverse.

## II.

Defendants  Christopher  Greer,  Daniel  Wood,  Sean  Tarrant, Michael Lawrence, and Jon Jordan were members of the Confederate Hammerskins, a white supremacist group based in Garland, Texas. The government collected evidence that the defendants and other Hammerskins conspired to deprive blacks, Hispanics and Jews of their civil rights.  This evidence indicated that the Hammerskins tried to drive blacks and Hispanics out of Robert E. Lee Park in Dallas in the summer of 1988.  On many occasions, they went to the park in small groups and chased, beat, and assaulted the blacks and Hispanics they found there.  There was also evidence that the defendants vandalized the Temple Shalom and Jewish Community Center in Dallas by spray painting them with swastikas and anti-Semitic graffiti, shooting out windows, and breaking doors.  The police interrupted a later plan to vandalize Jewish businesses in Dallas and Euless, Texas, in commemoration of the fiftieth  anniversary  of  Kristallnacht,  a  night  of  violence against Jewish businesses in Nazi Germany.

A  federal  grand  jury  returned  a  three  count  indictment charging the defendants with (1) conspiracy to deprive black and

Hispanic citizens of their rights under 42 U.S.C. § 2000a to use a public park, in violation of 18 U.S.C. § 241; (2) conspiracy to deprive Jewish citizens of their rights under 42 U.S.C. § 1982 to hold property, in violation of 18 U.S.C. § 241; and (3) using a firearm in the commission of the second offense, in violation of 18 U.S.C. § 924(c)(1) and (3).[8]  More specifically, the grand jury charged in count one that the defendants

> . . . did willfully conspire and agree with each other and other persons, known and unknown to the grand jury, to injure, oppress, threaten and intimidate Black and Hispanic citizens of the United States in the free exercise of the right secured to them by the Constitution and laws of the United States to the full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations of any place of public
> accommodation without discrimination on the ground of race, color, or national origin.
>
> It was part of the plan and purpose of this conspiracy that the defendants would join with others in Robert E. Lee park to chase, assault, and beat black and Hispanic persons in order to prevent them from enjoying the use of Robert E. Lee park, which was a symbol to the defendants of white supremacy.

and in count two that the defendants

> . . . did willfully conspire and agree with each other and others to injure, oppress, threaten and intimidate Jewish citizens of the United States in the free exercise and enjoyment of the right secured to them by the Constitution and laws of the United States to hold real and personal property in the same manner as that right is enjoyed by all citizens.
>
> It was part of the purpose and plan of the conspiracy to vandalize Jewish properties in the Dallas area and through such intimidation and threats of force to prevent Jewish persons from enjoying the holding of such property.

---

[8]     Tarrant and Greer were not charged in count three.

The case, tried in Dallas, Texas, touched deep emotions and sparked considerable publicity. Recognizing that the case was being called in a unique swirl of public debate and tension, the trial judge deviated from the usual procedures. At pre-trial, he explained to counsel how the jury would be selected. First, the judge would conduct the voir dire himself, as Rule 24 of the Federal Rules of Criminal Procedure permits. Second, rather than using the standard juror questionnaire recommended for complex cases in the Northern District of Texas, counsel were to submit proposed juror questionnaires. Third, members of the venire responding affirmatively to questions regarding their exposure to pretrial publicity would be examined separately regarding its effects on their ability to remain impartial.

Defense counsel submitted a proposed juror questionnaire as the district court had directed. Among defense counsel's proposed questions were "[w]hat is your religion?," "[d]o you regularly attend church, temple or other religious services?," and "[d]o you hold any offices in your church, temple or religious organization?". The judge agreed to submit the latter two questions but refused to include the question regarding the jurors' religious affiliation, although this question is standard on the juror questionnaires used in the state courts in Dallas County and recommended for the federal courts.[9]

_____

[9]     See Jury Manual, United States District Court, Northern District of Texas, Confidential Questionnaire. Question 11 is "What is your religious preference and church affiliation, if any?" Other questions include such matters as the prospective jurors' educational background, military service, employment

13

Before voir dire, defense counsel moved to strike for cause all black, Hispanic, and Jewish members of the venire, since they were the intended victims of the crimes charged in the indictment. The district court denied the motion, explaining that he would not presume that all members of these groups would consider themselves victims, or that they would be unable to observe their oaths. Defense counsel responded that he hoped part of the voir dire would get into matters of racial bias, given the fact that blacks, Hispanics, and Jews might serve as fact finders in a case alleging a conspiracy to deprive black, Hispanic, and Jewish citizens of their civil rights. The judge said he would "take a look at it and see."

With the entire venire in the courtroom, the judge asked them a number of questions as a group. He read the language of the indictment, and asked the following three questions regarding the issues involved in the case:

> Should the evidence show that the Confederate Hammerskins are a group which advocates white supremacy and that the defendants are members of such a group . . .could you give each of the Defendants the same presumption of innocence and the same benefit of following only the evidence adduced in court and the instructions or law that the Court gives you without any kind of bias or prejudice or sympathy or fear?

Two prospective jurors said that they could not and were later excused. The judge then told the venire:

> The charges in the indictment . . . [allege in]

status, hobbies, clubs, groups, union membership, the newspapers or magazines they read, and their favorite TV programs.

substance that the Defendants acted to interfere with the constitutional protected rights of other persons because of their race or color or national origin. The Government may put on evidence to demonstrate the Defendants' racial beliefs. However, I instruct you that the Defendants are not on trial for their racial beliefs, whether you agree with those beliefs or don't agree with those beliefs. Now is there anyone who could not follow that instruction? (No response.)

You can use evidence of the beliefs of a Defendant to help decide whether the Defendant may have acted or may have been motivated to act in accordance with those beliefs but you are here as jurors only to judge matters under the Charge and not whether a Defendant believed in such a way, had a belief. Whether he acted is what you will be talking about. Anybody who can't follow that sort of instruction? (No response)

He then returned the panel to the central jury room and conducted brief, separate interviews, in open court of each individual juror who had answered yes on the questionnaire as to whether they had read or heard any press reports about the case. He asked what they had heard or read and whether they could remain impartial despite what they knew. Juror Washington answered that she had read about the case and could not be fair. She was excused. Two of the venire persons who had read or heard about the case stated that the defendants had been referred to as bigots or racists. Our colleagues who would affirm are mistaken in their assertion that "several" venire persons referred to defendants in such terms. None did. They are also mistaken in their assertion that the district court did anything more than ask about pretrial publicity and whether the venire person could be fair in light of what they had seen or heard.

When this probe for the effects of pretrial publicity was concluded, defense counsel again renewed their objection to

15

seating victims of the alleged conspiracies on the jury. They also renewed their request to ask the venire specific questions about the subject matter of the case and whether that would affect their impartiality. They reminded the judge that the inflammatory nature of the evidence would make the case difficult for members of these groups--in other words, that it might be difficult for some members of these groups to remain impartial when they heard evidence of the desecrated temple, of violent racial assaults, and their clients' virulent hatred of blacks, Hispanics, and Jews. The judge replied that he had told the venire everything about the subject matter of the case that he was going to tell them. Defense counsel asked that the district court at least inquire which jurors were Jewish, so that they could exercise their peremptory strikes intelligently. The judge refused. The jury was impaneled, the case was tried, and the defendants were convicted on all counts.[10] There was no inquiry into the potential for racial bias in the venire other than the general questions indicating that the defendants were not on trial for their racial beliefs. Nor did the defendants ever learn whether any of the jurors who were selected were Jewish.

A panel of this court affirmed the convictions on appeal. It affirmed the district court's refusal to probe the venire for racial and ethnic biases, holding that the more general inquiries sufficiently explored potential bias. The panel also held that refusing to ask if any member of the venire was Jewish was

---

[10]    Lawrence was acquitted on the firearm count.

16

correct, rejecting the contention that the question was critical both standing alone and as the predicate to any meaningful interrogation.  According to the panel, whether to go beyond its more general questions to the venire was within the discretion of the trial judge.  Finally, it observed that a defendant could not peremptorily strike a member of the venire because that person was a Jew, reasoning that such a strike would have been unconstitutional under the Supreme Court's recent jurisprudence on race discrimination in jury selection.

### III.

The Sixth Amendment guarantees defendants the right to an impartial jury.  The questioning of prospective jurors at voir dire is critical to preserving that right.  "Without an adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 101 S. Ct. 1629, 1634 (1981) (citing Connors v. United States, 158 U.S. 408 (1895)).  Voir dire is also the only means by which the defendant can develop the information necessary to decide which jurors to challenge, either peremptorily or for cause.  "While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable." Swain v. Alabama, 380 U.S. 202, 220 (1965).  Both types of challenges are an essential part of the

17

process of ensuring trial by a fair and qualified jury.

In most contexts, we afford trial judges broad discretion in determining how best to conduct a voir dire. The trial judge is in the best position to evaluate the demeanor of prospective jurors and to draw conclusions about their partiality. There are special requirements, however, with respect to questioning prospective jurors in a case involving racial or ethnic bias. Rosales-Lopez, 101 S. Ct. at 1635. When racial issues are "inextricably bound up with the conduct of the trial," a voir dire must include questioning specifically directed to racial prejudice or bias to meet the constitutional requirement that an impartial jury be impaneled. Ristaino v. Ross, 424 U.S. 589, 597 (1976); Ham v. South Carolina, 409 U.S. 524 (1973). Even when racial issues do not pervade the case, the Court has exercised its supervisory power over federal courts to require inquiry into racial bias or prejudice in federal cases in which the defendant is accused of committing violent crimes against a member of a different racial or ethnic group. See Aldridge v. United States, 283 U.S. 308, 310 (1931); Rosales-Lopez, 101 S. Ct. at 1636; Ristaino, 424 U.S. at 597 n.9. In any case, "the exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." Aldridge, 283 U.S. at 310.[11]

---

[11] "The right to examine jurors on the voir dire as to the existence of a disqualifying state of mind, has been upheld with respect to other races than the black race, and in relation to religious and other prejudices of a serious character." Aldridge, 283 U.S. at 313.

There are conflicting values at stake in questioning the venire. Courts are understandably reluctant to create the impression that the outcome of the judicial process turns on the race of the participants in that process. See Ristaino, 424 U.S. at 596 n.8. On the other hand, so long as racial and ethnic prejudices are part of the human condition, we cannot will them away by refusing to probe both for their presence and their reach in a given case. Stoic pretense will not do. Seen from the eyes of the trial lawyer, this social pretense can have no place in jury selection. See Rosales-Lopez, 101 S. Ct. at 1635 ("[A criminal] trial is not the place in which to elevate appearance over reality."). We say nothing new. Over sixty years ago, the Court considered this conflict in Aldridge, supra, and firmly rejected the argument that "it would be detrimental to the administration of the law in the courts of the United States to allow questions to jurors as to racial or religious prejudices." 308 U.S. at 315. The Court concluded that "it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred." Id.

The issue in this case is whether the questions posed by the district court were sufficient to protect the parties from the risk that jurors with such disqualifying biases or prejudices would be selected. A trial judge has substantial discretion in conducting voir dire, but the Court has recognized that it is

19

usually best to allow the parties, typically the defendant in a criminal case, to determine whether or not they would prefer to have the inquiry into racial or ethnic prejudice pursued. Rosales-Lopez, 101 S. Ct. at 1636; United States v. Erwin, 793 F.2d 656, 668 (5th Cir. 1986). Global questions to a venire asking whether any member cannot follow his oath due to bias, prejudice, or partiality are not adequate in a case where racial animus is at issue. See Ham, 409 U.S. at 526.[12] No particular form or number of questions is required, but the questions must be sufficient to focus the attention of the prospective jurors on any racial prejudice they might harbor. Id. at 527.

Only recently the Court has emphasized the importance of asking specific questions designed to unearth the disqualifying views of prospective jurors. In Morgan v. Illinois, No. 91-5118 (June 15, 1992), the Court considered whether a state trial judge committed reversible error when he refused to ask members of a venire whether they would automatically vote to impose the death penalty if they found the defendant guilty. The trial court refused to ask this question, explaining that it had asked questions in a similar vein. It had explained the dictates of

---

[12] The Supreme Court held in Ham that the following three questions were not a sufficient probe of race.

> 1. Have you formed or expressed any bias or prejudice for or against him?
> 2. Are you conscious of any bias or prejudice for or against him?
> 3. Can you give the State and the defendant a fair and impartial trial?

409 U.S. at 526 n.3.

20

Illinois procedure in capital trials and asked whether the jurors would be able to follow its instructions in these matters even if they disagreed with them.  It had asked the prospective jurors whether they would automatically vote <u>against</u> the death penalty. It had asked whether the members of the venire knew of any reason that they could not be fair and impartial.

The Supreme Court reversed.  It explained that although voir dire is conducted under the supervision of the trial court, and a great deal must be left to its discretion, "part of the guaranty of the defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." __ U.S. at __.  Having compared this situation to the necessary inquiry into racial bias the Court had mandated in <u>Aldridge</u> and <u>Ham</u>, Justice White explained that general fairness and "follow the law" questions were insufficient to detect those in the venire who would automatically vote for the death penalty.  There is no "catechism for voir dire," but since jurors unalterably in favor of or opposed to the death penalty in every case could not perform their duties in accordance with law, specific questions to elicit these views from the members of the venire were necessary.

In short, how the trial judge gets at it is his call, but get to it he must.  Every experienced trial lawyer knows that the ritualistic global inquiry to the entire panel by the trial judge is only the beginning in sensitive cases.  The questioning that goes <u>beyond</u> this opening ritual is the essence of voir dire.  It is difficult for a venire person to confess to such bias and

21

prejudice, when all the while he is likely denying it to himself. But potential jurors are often asked sensitive and potentially embarrassing questions. See, e.g., Burton v. Johnson, 948 F.2d 1150, 1157-59 (10th Cir. 1991) (familial abuse); see generally United States v. Masat, 896 F.2d 88, 95 (5th Cir. 1990). The trial judge's questions must provide a reasonable assurance that racial bias or prejudice would be discovered if present. United States v. Harrelson, 754 F.2d 1153, 1161-62 (5th Cir. 1985); United States v. Samiento-Rozo, 676 F.2d 146, 148 (5th Cir. 1982). Furthermore, since voir dire is the basis for the exercise of peremptory challenges, the questioning must give the defendant an opportunity to make reasonably intelligent use of his strikes. Knox v. Collins, 928 F.2d 657, 661 (5th Cir. 1991); United States v. Ible, 630 F.2d 389, 394-95 (5th Cir. 1980); United States v. Moore, 936 F.2d 1508, 1514 (7th Cir. 1991). We evaluate the voir dire in this case with these principles in mind.

The trial judge asked the members of the venire some questions concerning the racial beliefs of the defendants, and whether they could remain impartial despite those beliefs. He did not ask about the racial biases or prejudices of members of the venire, however. Moreover, the judge had ruled from the outset that all inquiry regarding religion was out of bounds. Finally, the trial court asked no questions designed to elicit from the prospective jurors whether they could remain impartial even though they may have seen themselves as members of the class

22

of victims charged in the indictment.  In a trial in which white supremacists were accused of crimes against blacks, Hispanics, and Jews because they were black, Hispanic, and Jewish, the court's refusal to explore potential racial bias on voir dire in any meaningful way denied the defendants their constitutional right to an adequate voir dire.  Their convictions cannot stand.

The government sought to prove at trial that the defendants deprived citizens of their federally secured rights because they were members of racial minorities.  Regardless of whether we characterize all blacks, Hispanics, and Jews as the intended victims of the defendants' crimes, or only those in Dallas County, or only those who frequented the park, temple, and Jewish Community Center, it is plain that the indictment charged crimes that threaten members of these particular groups with violence. The very nature of the charged offenses therefore had a special significance for members of the venire who were black, Hispanic, or Jewish because hatred of their races was at the core of the prosecution's case.  In these circumstances, defense counsel needed to know which jurors were black, Hispanic, or Jewish, and to probe their ability to be fair in spite of their relationship to the charged offense.  The stunning fact is that two venire persons disqualified themselves in response to the global questions.  This was no comforting evidence that the global questions were adequate.  It was a large warning of trouble.  The rapid successive questioning of venire persons (usually one to three per page of the record) about pretrial publicity was no

23

more than whether each could be fair in light of what they had seen or read about the case. None were asked further questions about their own views beyond the question can you be fair. Thirteen "hesitated," to use the words of our colleagues, in answering that question. It is no answer that defendants collectively had fifteen strikes. It is no answer because we are left with approximately forty venire persons whose views are untouched--beyond the global questions and this jury was chosen from that pool.

We do not assume that all members of the targeted groups would be biased. But we cannot assume the contrary either. In this kind of case, at least some members of the racial groups targeted by the defendants' charged violence might be unable to remain impassive and impartial when confronted as jurors with evidence of these crimes. They were threatened by the conduct charged in the indictment. We do not find fairness less threatened because the potential bias of a prospective juror might arise not out of any racial animosity toward white defendants, but out of the threat to that juror as a member of the victim class. When the Court considered the racial question in Aldridge, it found it relevant not only that the defendant was black, but also that his victim was white. 283 U.S. at 309. The Court has continued to rely on the fact that the defendant and the victim are members of different racial or ethnic groups in assessing the need for inquiry into racial matters at voir dire. Rosales-Lopez, 101 S. Ct. at 1636; Turner v. Murray, 106 S. Ct.

24

1683, 1689 (1986).  Since the crime charged in this case not only involved interracial violence, but violence predicated on race, inquiry into the potential for racial bias among the members of the venire was crucial.

Instead of confronting these sensitive issues, as defense counsel urged, the trial judge skated around them.  The brief questions he posed to the venire as a group amounted to little more than asking them whether they could judge the defendants for what they did rather than what they thought.  This was an important issue as the trial judge commendably recognized, but there was no inquiry into whether the jurors held racial biases or saw themselves as victims of the charged offenses.  This critical area--the most critical area--was roped off from beginning to end.

We intend no undue criticism of the trial court.  This was not an indifferent trial judge or a judge who failed to see that he had a sensitive and difficult case to try.  The district court confronted the apparent tension between the recent emphasis upon the rights of venire persons to be free of discrimination and the rights of the parties to an impartial jury.  It opted to protect the venire members to the point of refusing to ask if any person adhered to the Jewish faith.  This lacuna in an otherwise adequate examination of the venire is explainable only in this way, as evidenced by the quite different ways of handling the distinct issues of the effects of pretrial publicity and the possibility of prejudice and bias triggered by the highly

25

emotional charges in this case.

The court's refusal to explore the issue of racial bias and to allow defense counsel to discover which jurors were Jewish was reversible error. The convictions of <u>Ham</u> and <u>Aldridge</u> were reversed when the Court found the voir dire in those cases lacking. The lower courts have not hesitated to reverse convictions when the particular circumstances of the case made clear that the voir dire was inadequate. <u>See, e.g.</u>, <u>United States v. Bear Runner</u>, 502 F.2d 908 (8th Cir. 1974) (voir dire on racial bias in trial of American Indian was inadequate given the racial tensions in South Dakota arising out of the events at Wounded Knee); <u>United States v. Evans</u>, 917 F.2d 800, 806 (4th Cir. 1990) (voir dire on the credibility of law enforcement officials was inadequate when the case would be a swearing match between the defendants and a DEA agent). Courts have also found reversible error when the trial judge refused to allow defense counsel to discover critical facts about the members of the venire. <u>See, e.g.</u>, <u>Aldridge</u>, 283 U.S. at 313 (citing with approval a California court's reversal of convictions when Mexican defendants were not allowed to determine whether jurors were members of the xenophobic Know Nothing party); <u>United States v. Ible</u>, 630 F.2d 389, 394-95 (5th Cir. 1980) (inquiry into prospective jurors' religious beliefs about alcohol was required on voir dire when this would be an issue at trial). The case for reversal here is stronger than in any of these others, since the court failed to explore the issue of racial bias and refused to

26

allow defense counsel to discover the race of Jewish members of the venire when these matters were part and parcel of the charged offenses.

Finally, we note that information as to whether members of the venire were Jewish was essential for the defendants to make reasonably intelligent use of their peremptory challenges. In recent years the Supreme Court has restricted the use of peremptory strikes on the basis of race. See Batson v. Kentucky, 476 U.S. 79 (1986); Edmonson v. Leesville Concrete Co., 111 S. Ct. 2077 (1991). The Court explained in Batson that the Equal Protection Clause forbids the State to strike venire persons on the assumption that they will be biased because of the race of the defendant, or presumably the race of the victim. 476 U.S. at 97-98. This term it extended its holding to the exercise of peremptories by criminal defendants. Georgia v. McCollum, No. 91-372 (June 18, 1992). "Be it at the hands of the State or the defense, if a court allows jurors to be excluded because of group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice." __ U.S. at __.

Any perceived tension between the Court's recent jurisprudence on race discrimination in jury selection and its decisions on the adequacy of voir dire questioning is illusory. The line of cases beginning with Aldridge, and continuing with Ham and Rosales-Lopez recognize that it is an unfortunate fact in our society that violent crimes perpetrated against members of

27

other racial or ethnic groups are attended by a significant risk that racial or ethnic prejudice will influence jury verdicts. See Rosales-Lopez, 451 U.S. at 192. Batson, Edmonson, and McCollum, on the other hand, stand for the proposition that assumptions of juror partiality based on race have no place in a court of law. Both lines of cases mandate that racist views be eliminated from the jury selection process, both those of potential jurors and counsel deciding which prospective jurors to strike.

Thus the Court's decision in McCollum magnifies the necessity for a probing inquiry into individual racial bias at voir dire. As Justice Blackmun observed, "there is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a peremptory challenge to remove an individual juror who harbors racial prejudice." __ U.S. __. Without adequate voir dire, defendants cannot dissipate fears and concerns in sensitive cases as to whether individual jurors harbor racial prejudices or biases. Qualification to serve will not be developed, and the parties cannot intelligently exercise their peremptory strikes if the questioning of members of the venire is insufficient to expose which among them would likely be biased.

In this case, the defendants were charged with crimes of violence against blacks, Hispanics, and Jews as blacks, Hispanics, and Jews. In these circumstances, the defendants needed to know which members of the venire were members of these

28

groups in order to explore the potential for racial bias in any meaningful sense. They could have exercised peremptory strikes against jurors in these groups if further questioning indicated that they could not remain impartial because of their relationship to the charged offenses. Instead, the trial judge denied defense counsel this information and refused to ask the jurors questions about the issue of racial bias. A peremptory challenge of a Jewish member of the venire could have been based not on the assumption that Jews are uniformly biased because of an affinity for other members of their race, but it could have been based on a determination that individual Jewish members of the venire may well have seen themselves as persons threatened by the charged conduct. This is not the stereotypical attributive stuff of an equal protection violation; rather it is a legitimate reason for a peremptory strike. Compare Hernandez v. New York, 111 S. Ct. 1859 (1991) (upholding peremptory challenges against Hispanic jurors since they might not be able to defer to English translation of testimony in Spanish).

Moreover, it is difficult for us to understand how attributing to a venire person a nearly universal human characteristic SQsuch as a tendency to hostility toward those who threaten the individual because of his membership in a groupSQmay properly be described as stereotyping or discriminating against that particular group (or individual). Stereotyping implies attributing to the group (and individual member) characteristics different from those that are otherwise common, and

29

discriminating against implies acting on the basis of such perceived differences. It would be stereotyping the group and the individual to assume that it and he (because he was of that group) did <u>not</u> have such common human characteristics.

We think the district court would have furthered rather than frustrated the policy against race discrimination in jury selection had it inquired into the issue of racial bias in this case. Indeed, the Court's holding in <u>Ham</u> was grounded in the idea that a principal purpose of the Fourteenth Amendment was to prohibit the States from invidiously discriminating on the basis of race. 409 U.S. at 526-27. The district court erred when it created a "right" of a venire person to be free of even a neutral question of religion affiliation.

If we are to eliminate peremptory challenges based on racial stereotypes, as <u>Batson</u>, <u>Edmonson</u>, and <u>McCollum</u> mandate, we must insist on a searching inquiry into the <u>individual</u> biases and prejudices of members of the venire in civil rights cases redolent with prejudice, bias, and anger. This includes investigation of the potential for racial bias on the part of individual jurors. This able trial judge was led by perceived signals of <u>Batson</u> to a stance overly protective of venire persons. These <u>crimes</u> are despicable, but then <u>defendants</u> at the time of voir dire were only charged with them. The moral repugnance of the acts charged in this indictment only accentuates the demand for a thorough voir dire. The rights of defendants were lost in the effort to protect the venire.

30

There are no magic questions to be asked venire persons and we require none today.  The trial judge has discretion to control the voir dire, but there are limits.  The federal trial judge is a puissant figure but he is no more important than counsel.  This is a three-cornered play of prosecutor, judge, and defense counsel--<u>three players</u>, not one.  We would reverse for a new trial.